THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.* THE ADIRONDACK RAILWAY COMPANY, Respondent, Impleaded with the INDIAN RIVER COMPANY et al.

1. APPEAL — PRESUMPTION AS TO FACTS. When, on appeal from a reversal by the Appellate Division of a judgment in an action tried by the court, it appears that the decision of the trial court did not separately state the facts found, and the decision of the Appellate Division does not state that the reversal was upon a question of fact, it must be presumed that all the facts warranted by the evidence and necessary to support the judgment were found by the trial court, and that the reversal by the Appellate Division was based wholly upon errors of law, the facts standing approved by that court.

2. ADIRONDACK PARK — FOREST PRESERVE — ACQUISITION OF LAND BY STATE TO EXCLUSION OF RAILROAD. Where the special condemnation proceedings prescribed by the Adirondack Park Act of 1897 (Ch. 220), instituted, under that act, by the forest preserve board, against lands of a private owner within the territory of the Adirondack park, were fully completed, by service of the certificate of condemnation on the owner, before the Adirondack Railway Company, which had previously filed a map and profile for an extension of its road through the same lands, commenced condemnation proceedings on its part, the title to the strip of land designated for the route of the railroad passed to the state at the moment of the completion of its condemnation proceedings, the land then became a part of the forest preserve, and thereupon the provision of the Constitution (Art. 7, § 7), that lands constituting the forest preserve shall not be "taken by any corporation, public or private," intervened against the railway company, the act of 1897 being a valid and binding law.

3. EMINENT DOMAIN — DIRECT EXERCISE OF RIGHT BY STATE — CONSTITUTIONALITY OF ADIRONDACK PARK ACT — DUE PROCESS OF LAW — COMPENSATION. The Adirondack Park Act, which provides that the forest preserve board may take possession of any land within the territory of the Adirondack park which it deems advisable for the interests of the state, and that such land shall be acquired by the making of a certificate of condemnation by the board, to be followed by payment to the owner, with a provision for a hearing in the Court of Claims as to the amount of compensation, satisfies the constitutional requirements of due process of law and compensation in the taking of property.

4. NO LIEN CREATED, AS AGAINST STATE, BY FILING MAP OF PROPOSED RAILROAD. *It seems,* that no lien, or any right in the nature of a lien, upon private property, can be created, as against the state, by the simple filing of a map and service of notice upon occupants, by a corporation organized to construct a railroad; but if it be assumed that a lien is so acquired, it is a lien created by statute, which can be abolished by stat-

29

ute, without compensation, before any rights under it have become vested, and such an abolition is effected by a taking of the property by the state under the Adirondack Park Act, which provides for compensation to the landowner only.

5. No Compensation for Taking Paper Railroad Route. There is no property in a naked railroad route, existing on paper only, which the state is obliged to pay for when it needs the land covered by that route for a great public improvement, and its officers are authorized to act by appropriate legislation.

6. Public Use. The appropriation of land for the Adirondack park is for a public use.

7. Exclusion of Railroads. The command of the Constitution, that the lands of the forest preserve cannot be "taken by any corporation, public or private," shows an unmistakable intention to keep railroads out of the Adirondack park.

*People* v. *Adirondack Ry. Co.,* 39 App. Div. 34, reversed.

(Argued June 19, 1899; decided October 3, 1899.)

Appeal from an order of the Appellate Division of the Supreme Court in the third judicial department, made March 8, 1899, reversing a judgment in favor of the plaintiff entered upon the decision of the court at Special Term, and granting a new trial.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Edward Winslow Paige* and *G. D. B. Hasbrouck* for appellant. The acceptance by the forest preserve board of the offer of McEchron and others, followed by the entry of the state upon the lands, the survey, and the beginning and continuing of the building of the dam, which was to cost a sum so considerable as $67,000, before the filing of the map by the railway company, gave to the People of the state an equitable title, good against all later liens. (*Dodge* v. *Gallatin,* 130 N. Y. 117; *Freeman* v. *Freeman,* 43 N. Y. 34; *Miller* v. *Ball,* 64 N. Y. 286; *Lowry* v. *Tew,* 3 Barb. Ch. 407; Willard's Eq. Juris. [Potter's ed.] 286; Story's Eq. Juris. § 761.) If, by the filing of its map, the defendant has obtained a lien, the state, by its appropriation proceeding, has taken that lien. (*Watson* v. *N. Y. C. R. R. Co.,* 47 N. Y. 157; *Matter of City of Buffalo,* 68 N. Y.

167; *Bloodgood* v. *M. & H. R. R. Co.*, 18 W. R. 9; Const.
N. Y. art. 1, § 7.) The defendant has not any "lien" upon
that portion of the earth's surface which is township
15. (*People* v. *O'Brien*, 111 N. Y. 1; *St. Peter* v. *Deni-
son*, 58 N. Y. 416; *Birdsall* v. *Cary*, 66 How. Pr. 358;
*Forster* v. *Scott*, 136 N. Y. 577; *Matter of Washington Park*,
56 N. Y. 144; *Matter of S. B. & N. Y. R. R. Co.*, 4 Hun,
311; *Beekman* v. *S. & S. R. R. Co.*, 3 Paige, 45; *Rogers* v.
*Bradshaw*, 20 Johns. 735; L. 1894, ch. 338, §§ 37, 70, 73;
*Pumpelly* v. *G. B. Co.*, 13 Wall. 166; *Matter of P. Bridge
Co.*, 108 N. Y. 483.) The fifteen days not having expired
when the state, but for the injunction, would have acquired
the title to township 15 and when the deed was actually
put in escrow, the route of the defendant has not become
located nor has any lien been acquired by it as against the
state. (*Riggs* v. *Palmer*, 115 N. Y. 506; *People ex rel.* v.
*Barker*, 152 N. Y. 417; *A. B. & C. Co.* v. *Conner*, 103 N.
Y. 502; *Shellington* v. *Howland*, 53 N. Y. 371; *Kingsley* v.
*City of Brooklyn*, 78 N. Y. 200; *Hunting* v. *Blun*, 143 N.
Y. 511; *U. G. Co.* v. *Vary*, 152 N. Y. 121; *R. H. & L. R.
R. Co.* v. *N. Y., L. E. & W. R. R. Co.*, 110 N. Y. 128;
*Matter of L. I. R. R. Co.*, 45 N. Y. 364; *People ex rel.* v.
*Tubbs*, 49 N. Y. 356.) The forest preserve has been made
by the state with the deliberate intention of excluding corpo-
rations and particularly railroad corporations from it. (*Matter
of B. & A. R. R. Co.*, 53 N. Y. 574; *S. R. T. Co.* v. *Mayor*,
*etc.*, 128 N. Y. 510.) The defendant is forbidden by the
Constitution from taking from the state the lands in question.
(*Rogers* v. *Bradshaw*, 20 Johns. 735.)

*Lewis E. Carr* and *R. Burnham Moffat* for respondent.
The Adirondack Railway Company, by its survey, by its map
and profile filed, and by the notice of filing served, acquired
and was vested with a right to prosecute its proceedings for
the acquisition of the title to its right of way, and to construct
and operate its proposed railroad thereover, superior to any
right of the state in or to said lands. (*Matter of Board of*

*Street Opening,* 133 N. Y. 329 ; *P. W. W. Co.* v. *Bird,* 130 N. Y. 249 ; *Matter of D. C. Assn.,* 66 N. Y. 569 ; *Matter of Furman Street,* 17 Wend. 649 ; *Beekman* v. *S. & S. R. R. Co.,* 3 Paige, 45 ; *E.,* etc., *P. R. Co.* v. *B. & P. R. R. Co.,* 20 Barb. 644 ; *People ex rel.* v. *Tubbs,* 59 Barb. 401 ; Code Civ. Pro. §§ 3360, 3371, 3381 ; *Munn* v. *Worrall,* 53 N. Y. 44.) Apart from its attempt to acquire the six-rod strip of land across township 15 under the provisions of the seizure act (L. 1897, ch. 220) the state did not acquire any title to the land in controversy which was not subject and subordinate to the vested right of the defendant company therein and thereto. (*Matter of N. Y., L. & W. R. R. Co.,* 99 N. Y. 12 ; *Matter of B. & A. R. R. Co.,* 53 N. Y. 574 ; *Matter of R. W. Comrs.,* 66 N. Y. 413, 418 ; *P. P.,* etc., *R. R. Co.* v. *Williamson,* 91 N. Y. 552.) The state did not acquire the right-of-way strip under the seizure act of 1897, freed from the right of the defendant company, even if that statute should be held to be valid. (*S. R. T. Co.* v. *Mayor,* etc., 128 N. Y. 510 ; *Matter of City of Buffalo,* 68 N. Y. 167 ; *Matter of L. L. R. R. Co.,* 11 App. Div. 233 ; *People* v. *O'Brien,* 111 N. Y. 1 ; *N. O. R. R. Co.* v. *Delamore,* 114 U. S. 501 ; *Forster* v. *Scott,* 136 N. Y. 577 ; *Gunn* v. *Barry,* 15 Wall. 622.) The dicta of Mr. Justice Herrick in the case of *Adirondack Railway Company* v. *Indian River Company* (27 App. Div. 326) proceeded upon an erroneous interpretation of the statute. (*Matter of L. L. R. R. Co.,* 11 App. Div. 233 ; *Forster* v. *Scott,* 136 N. Y. 577.) Chapter 220 of the Laws of 1897 violates sections 1 and 6 of article 1 of the Constitution of the state of New York, in that it authorizes the seizure by the state of private property contrary to the "law of the land" and without "due process of law;" and for the same reasons is in direct violation of the 14th amendment to the Constitution of the United States. (*Bank of Columbia* v. *Okely,* 4 Wheat. 244 ; *Bertholf* v. *O'Reilly,* 74 N. Y. 509 ; *Weiner* v. *Bunbury,* 30 Mich. 201 ; *Wilkinson* v. *Leland,* 2 Pet. 657 ; *Matter of D. C. Assn.,* 66 N. Y. 572 ; *Beekman* v. *S. R. R. Co.,* 22 Am. Dec. 691 ; *Scott* v.

*City of Toledo*, 36 Fed. Rep. 397; *People ex rel.* v. *Super-visors*, 70 N. Y. 234; *Stuart* v. *Palmer*, 74 N. Y. 183; *People* v. *Turner*, 117 N. Y. 236.) The act of 1897 violates section 17 of article 3 of the Constitution of the state of New York, in that it provides that an existing law shall be made or deemed a part thereof, or shall be applicable thereto, without inserting such law in the act. (*People ex rel.* v. *Banks*, 67 N. Y. 575; *Matter of U. F. Co.*, 98 N. Y. 139; *People ex rel.* v. *Squire*, 107 N. Y. 602; *People ex rel.* v. *Lorillard*, 135 N. Y. 291; *Matter of Lorillard*, 36 N. Y. S. R. 231; *Curtin* v. *Barton*, 54 N. Y. S. R. 816.)

VANN, J.   In 1882 the Adirondack Railway Company was incorporated for the term of one thousand years to construct and operate a railroad from Saratoga Springs to the River St. Lawrence, near the city of Ogdensburg.   It was a reorganiza-tion of an older corporation known as the Adirondack Com-pany, which was organized in 1863, under the provisions of chapter 236 of the laws of that year.   Prior to the fore-closure which resulted in the reorganization, the Adirondack Company had constructed a railroad from Saratoga Springs to North Creek, in the county of Warren, and this railroad, together with the right to extend the same, became the prop-erty of the Adirondack Railway Company, which, in April, 1892, applied to the railroad commissioners for a certificate, under chapter 565 of the Laws of 1890, to relieve it from the statutory obligation of extending its lines and on the 9th of May following, the commissioners issued their certificate accord-ingly.   The Adirondack Railway Company, thenceforth called the defendant, made no attempt to extend its road until the early part of 1897, when a survey was made for a proposed extension from North Creek through the counties of Warren, Hamilton and Essex, to the outlet of Long Lake in Hamilton county, where it was expected that, by connecting with other roads, a route would be secured to the St. Lawrence river. Before anything further was done to extend the road, certain action, taken by the state, should be briefly alluded to.

In 1885 the forest preserve was created by statute, embracing "all the lands now owned, or which may be hereafter acquired by the state of New York within" certain counties, and the area was extended by subsequent legislation. (L. 1885, ch. 283; L. 1887, ch. 639; L. 1893, ch. 332.) These acts required said lands to be forever kept as wild forest lands, and provided that they should not be sold, leased or taken by any corporation, public or private. A forest commission with appropriate powers was created to care for the forest preserve, and appropriations were made from time to time to enable it to properly discharge its duties.

In 1890 the forest commission was authorized to " purchase lands so located within such counties as include the forest preserve, as shall be available for the purposes of a State park," and in 1892 the Adirondack park was established and placed under the control of said commission. (L. 1890, ch. 37 ; L. 1892, ch. 707.)

The revised Constitution, which went into effect on the 1st of January, 1895, provides that " the lands of the State, now owned or hereafter acquired, constituting the forest preserve as now fixed by law, shall be forever kept as wild forest lands. They shall not be leased, sold or exchanged, or be taken by any corporation, public or private, nor shall the timber thereon be sold, removed or destroyed." (Const. art. 7, § 7.)

In 1895, the legislation relating to the forest preserve and the Adirondack park was extended by the Fisheries, Game and Forest Law, and it was declared by section 290 that " such park shall be forever reserved, maintained and cared for as ground open for the free use of all the people for their health and pleasure and as forest lands necessary to the preservation of the head waters of the chief rivers of the state, and a future timber supply; and shall remain part of the forest preserve." (L. 1895, ch. 395, §§ 270, 295.) During the same year the forest commission was authorized to purchase 80,000 acres for the use of the Adirondack park. (L. 1895, ch. 561.)

In 1897 an act was passed, the object of which, according

to its title, was "to provide for the acquisition of land in the territory embraced in the Adirondack Park, and making an appropriation therefor." (L. 1897, ch. 220.) By this act the appointment of a forest preserve board was authorized, and it was made its duty "to acquire for the State, by purchase or otherwise, land, structures or waters, or such portion thereof in the territory embraced in the Adirondack Park, as defined and limited by the Fisheries, Game and Forest Law, as it may deem advisable for the interests of the State." Section 3 of said act provides that "the forest preserve board may enter on and take possession of any land, structures and waters in the territory embraced in the Adirondack Park, the appropriation of which in its judgment shall be necessary for the purposes specified in section 290 of the Fisheries, Game and Forest Law, and in section 7 of article 7 of the Constitution." It is provided by the next section that "upon the request of the forest preserve board an accurate description of such lands so to be appropriated shall be made by the State Engineer and Surveyor, or the superintendent of the state land survey, and certified by him to be correct, and such board or a majority thereof shall indorse on such description a certificate stating that the lands described therein have been appropriated by the state for the purpose of making them a part of the Adirondack park; and such description and certificate shall be filed in the office of the Secretary of State. The forest preserve board shall thereupon serve on the owner of any real property so appropriated a notice of the filing and the date of filing of such description, and containing a general description of the real property belonging to such owner which has been so appropriated; and from the time of such service, the entry upon and appropriation by the state of the real property described in such notice for the uses and purposes above specified shall be deemed complete, and thereupon such property shall be deemed and be the property of the state. Such notice shall be conclusive evidence of an entry and appropriation by the state." (§ 4.) Provision is made by the next section for the payment for lands so taken

and for damages resulting from the appropriation, by agreement with the owner and the delivery of a certificate payable by the state treasurer upon the warrant of the comptroller. (§ 5.) If the forest preserve board is unable to agree with the owner upon the value of the property appropriated, the owner, within two years after the service upon him of the notice of appropriation, may present a claim for the value of the land to the Court of Claims, which has jurisdiction to hear and determine the same and to render judgment thereon. The amount of the final judgment is payable by the treasurer upon the warrant of the comptroller. (§ 6.) No provision is made by the act for the payment of any lien upon the lands except that when a judgment for damages is rendered and it appears that there is a lien or incumbrance upon the property appropriated, the amount thereof shall be stated in the judgment and the comptroller may deposit the amount awarded in the proper bank to be paid and distributed to the persons entitled to the same as directed by the judgment. (§ 19.) The sum of $600,000 was appropriated for the purposes specified in the act, and the comptroller was authorized to borrow $400,000 more upon the request of the forest preserve board to be expended under its direction.

On the 6th of August, 1897, after certain negotiations with the owners of a part of an extensive tract of land known as the Totten & Crossfield purchase, the forest preserve board passed a resolution accepting the offer of the owners of about 18,000 acres of township 23, and 32,000 acres of township 15 of that purchase for the sum of $149,000, of which $99,000 was for the land and $50,000 was for certain improvements at Indian Lake for the use of the state, to be made in accordance with the plans and specifications to be furnished by the state engineer. Township 15 of the Totten & Crossfield purchase lies, as is admitted in the answer, " wholly within the bounds of the forest preserve and also of the Adirondack park." Upon the 15th of August, 1897, a representative of the state engineer with a surveying party began surveying at Indian Lake for the purpose of constructing a dam at its mouth in

order to stow water for the use of the Champlain canal and for water power on the Hudson river.   Upon the completion of the survey plans and specifications were prepared and the construction of the dam was commenced.

September 18th, 1897, the defendant caused a map and profile to be filed in the counties of Hamilton, Warren and Essex for the extension of its road across township 15, which the forest preserve board had agreed to purchase as aforesaid, and which lies partly in each of said three counties.   It also gave notice of such filing to the occupants as required by statute, but did nothing else.   About the 1st of October following, as the owners were about to convey to the state the lands covered by the resolution of August 6th, and receive their money, they were restrained from so doing by an injunction issued in an action brought by the Adirondack Railway Company against them.   Thereupon they placed the deed *in escrow* to be delivered when the injunction was dissolved, made another deed embracing the same premises, except the land described in the railroad survey, delivered it to the forest preserve board, and received the $99,000, according to agreement.   Immediate steps were taken to vacate the injunction, but they were not at first successful, and on the 7th of October the forest preserve board met, and learning that the justice who granted the injunction had declined to vacate it, they took steps to appropriate the land in question for a park under the power of eminent domain.   The state engineer having furnished a description in writing of the six-rod strip, which the defendant desires for a railroad, and certified that the same was correct, the three members of the forest preserve board, acting under chapter 220 of the Laws of 1897, annexed thereto a certificate of condemnation and signed the same as the forest preserve board, in these words : " State of New York, county of Albany, city of Albany, ss.   We, Timothy L. Woodruff, Charles H. Babcock and Campbell W. Adams, being the forest preserve board, acting under and in pursuance to an act of the legislature of the state of New York, being chapter 220 of the Laws of 1897, entitled 'An act to provide for the

acquisition of land in the territory embraced in the Adirondack park and making an appropriation therefor,' do hereby certify that the lands in township 15, Totten & Crossfield purchase, in the counties of Hamilton, Essex and Warren, of the state of New York, described in the foregoing certificate of the state engineer, have been and hereby are duly appropriated by the state of New York for the purpose of making them a part of the Adirondack park." These papers, indorsed "state engineer's certificate and description and forest preserve board's certificate of condemnation," were filed in the office of the secretary of state on the 7th of October, 1897. On the same day a notice of this action of the board, with a general description of the property appropriated and a copy of the papers above mentioned, were served on William McEchron, the president of the Indian River Company, which then owned the lands involved. This service was made, as the Special Term is presumed to have found, at ten minutes before noon. On the same day the defendant began proceedings to condemn said strip for the purpose of extending its railroad, but as the Special Term is also presumed to have found, they did not file the *lis pendens* until afternoon, and hence not until after the aforesaid proceeding in behalf of the state had been completed. No notice of condemnation was served on the defendant.

On the 2nd of March, 1898, the injunction restraining the conveyance of said lands to the state was reversed on appeal by the Appellate Division, and thereupon the original deed *in escrow* was delivered and recorded. The defendant went on with its condemnation proceedings until it was restrained by a temporary injunction granted in this action, which was brought to restrain that company and the other defendants from further continuing the proceedings to condemn.

The defendant alone answered, and after a trial the Special Term rendered judgment for the People, perpetually enjoining it from taking the land. Upon appeal the judgment was reversed by the Appellate Division and a new trial ordered, by a divided vote, upon the ground that the company, by the

filing of its map on the 18th of September, had impressed upon the land a lien that was good as against the state of New York. The People have appealed to this court, giving the usual stipulation for judgment absolute.

From the form of the decision of the Special Term, which did not separately state the facts found, and of the Appellate Division, which did not state that the judgment was reversed upon a question of fact, it must be presumed that all the facts warranted by the evidence and necessary to support the judgment were found by the Special Term, and that the reversal by the Appellate Division was based wholly upon errors of law, the facts standing approved by that court. (*Petrie* v. *Hamilton College*, 158 N. Y. 458, 463 ; Code Civ. Pro. §§ 1022, 1338.) For the purpose of this appeal, therefore, we must assume that the condemnation proceedings instituted by the forest preserve board were fully completed, as required by the statute of 1897, before proceedings to condemn on its part were commenced by the defendant. Hence, if the Condemnation Act of 1897, under which the forest preserve board acted, is in all respects a valid and binding law, title to the strip of land in question passed to the State before the defendant began the proceedings sought to be restrained in this action. The moment the title passed, said land became a part of the forest preserve, and thereupon the Constitution spoke and commanded that it should not " be taken by any corporation, public or private." (Art. 7, § 7.) If the state, at any time and by any method, became the lawful owner, whether legal or equitable, of the land in question, *eo instanti*, this general and sweeping command of the fundamental law was addressed to the defendant, and rendered unlawful every effort at condemnation of that land on its part. Whether the state became the equitable owner through contract, possession and performance, we shall not discuss, as we think it became the legal owner through the power of eminent domain.

The defendant does not attack the regularity of procedure on the part of the state, but contends that the act, under which the state proceeded, is void, because it violates both the Fed-

eral and State Constitutions. Its more specific contention is that said act is unconstitutional, because it authorizes the seizure by the state of private property without due process of law, and without making compensation therefor.

Due process of law, sometimes called the law of the land, is not defined by either Constitution or by any statute, and judges of the highest standing and widest experience, in various jurisdictions, have pronounced it incapable of definition, so exact as to fit all cases, and attempts to define have usually been confined to the facts of the case in hand. (*Bertholf* v. *O'Reilly,* 74 N. Y. 509, 519; *Davidson* v. *New Orleans,* 96 U. S. 97, 104.) While to a reasonable extent it may be regulated by statute, ordinarily it rests upon established custom, and a method of procedure having the sanction of settled usage is commonly regarded as due process of law. It does not necessarily mean a judicial proceeding, for a man may be lawfully deprived of his property through the power of taxation, or of the use of his property through the police power without the intervention of any court. (*McMillen* v. *Anderson,* 95 U. S. 37, 41.) In many cases due process of law is wanting when there is no opportunity for the person whose rights are affected to be heard, but this does not apply to the taking of private property by the state for public use through the power of eminent domain, except as to the subject of compensation, unless some statute requires a hearing. (Cooley's Const. Lim. 356.)

The power of taxation, the police power and the power of eminent domain, underlie the Constitution and rest upon necessity, because there can be no effective government without them. They are not conferred by the Constitution, but exist because the state exists, and they are essential to its existence. They are not rights reserved, but rights inherent in the state as sovereign. While they may be limited and regulated by the Constitution, they exist independently of it as a necessary attribute of sovereignty. They belong to the state because it is sovereign, and they are a necessity of government. The state cannot surrender them, because it cannot

surrender a sovereign power. It cannot be a state without them. They are as enduring and indestructible as the state itself. (Black Cons. Law, § 123; Cooley Const. Lim. 524; Eminent Domain by Randolph, 77; Lewis, § 3; Mills, § 11.) Each is a peculiar power, wholly independent of the others, and not one of them requires the intervention of a court for effective action by the state. In the case of eminent domain, when the state is not itself an actor, compensation for property taken, unless the amount is agreed upon, can be ascertained only through the aid of a court, but otherwise judicial action is unnecessary except as provided by statute. (State Const. art. 1, § 7.)

The power of eminent domain is the right of the state, as sovereign, to take private property for public use upon making just compensation. The state has all the power of eminent domain there is and all that any sovereign has, subject to the limitations of the Constitution. Although exercised under our first Constitution, it is not mentioned therein, and it is now mentioned only for the purpose of limitation. The language of the Revised Constitution is as follows: "No person * * * shall be deprived of life, liberty or property without due process of law; nor shall private property be taken for public use, without just compensation;" and "when private property shall be taken for any public use, the compensation to be made therefor, when such compensation is not made by the state, shall be ascertained by a jury, or by not less than three commissioners appointed by a court of record, as shall be prescribed by law." (Const. art. 1, §§ 6 and 7.) This language, which presupposes the existence of the power outside of the Constitution, simply regulates the right to use it. It does not confer the power, but recognizing its existence, surrounds it with proper limitations. It prescribes no method of action, when the state acts for itself, but marks out certain boundaries which may not be crossed, even by the state. Within those boundaries, the state, acting through that department which exerts the legislative power, may proceed at will, and the extent, method and

necessity of exercising the power to take private property for public use may not be interfered with by either of the other departments of government. (*Garrison* v. *City of New York*, 88 U. S. 196.) All private property, both tangible and intangible, is subject to the right, including that already devoted to a public use, although the latter, as matter of policy rather than of right, is protected and favored by the state to some extent. (*People* v. *Kerr*, 27 N. Y. 188; *Matter of the City of Buffalo*, 68 N. Y. 167.) While the state may delegate the power to a subject for a public use, it cannot permanently part with it as to any property under its jurisdiction, but may resume it at will, subject to property rights and the duty of paying therefor. There is no limitation upon the exercise of the power except that the use must be public, compensation must be made and due process of law observed. (*Secombe* v. *R. R. Co.*, 90 U. S. 108; *Matter of Fowler*, 53 N. Y. 60, 62.)

Now, what does the phrase "due process of law" mean, when thus applied to the exercise of a sovereign power, and to the effort of government through that power to accomplish a great public purpose? Does it have the same meaning as when applied to the action of the state in punishing a man for crime, or of one individual in seeking to enforce a civil right against another? Due process of law necessarily varies with the facts of the case and depends upon the necessity for safeguards against the exercise of arbitrary power. It consists in the observance of those safeguards which time and experience have shown are necessary to protect the citizen in the enjoyment of life, liberty and property. In public prosecutions, as well as private controversies, an opportunity to be heard is essential to protect private rights; but here we have a case where the state has the right to take a man's property against his will, although he has been guilty of no wrong. It is a case where of necessity, if there is any action at all, it must be arbitrary. The state needs the property and takes it, and while the citizen cannot resist, he has the right to insist upon just compensation to be ascertained by an impartial tribunal. It is a compulsory purchase by public authority, and the

individual receives money in the place of the property taken. He has a right to his day in court on the question of compensation, but he has no right to a day in court on the question of appropriation by the state unless some statute requires it. (*Matter of Village of Middletown,* 82 N. Y. 196, 201.) There is no necessity for any safeguard against taking, because the right to take is all there is of the power of eminent domain, and is necessarily conceded to exist when the existence of the power is admitted. Safeguards become necessary only when the question of compensation is reached, and then the courts are careful to see that the owner receives all that he is entitled to. Until then the courts could not help him, unless some statutory right were invaded, as the method of taking is within the exclusive control of the legislature. If a statute requires judgment of condemnation, judgment must be had accordingly before the property can be taken, but otherwise a certificate of condemnation by an executive officer, followed by payment, satisfies every requirement of the Constitution. If the use is not public, the statute authorizing condemnation is void, but this question of law need not be settled in the proceeding to take, as it can be raised by the property owner in a variety of ways. It would be the same in effect as if the attempt to condemn had been made without any statute whatever, and an action of trespass against those who undertook to take possession of the property would settle the question. (*Wheelock* v. *Young,* 4 Wend, 648.)

As we have already seen, a method of procedure based upon long-established usage is ordinarily due process of law. "It is sufficient * * * to say that legislation is not open to the charge of depriving one of his rights without due process of law, if it be general in its operation upon the subjects to which it relates, and is enforceable in the usual mode, established in the administration of government with respect to kindred matters: that is, by process or proceedings adapted to the nature of the case." (*Dent* v. *West Virginia,* 129 U. S. 114, 124.) How does the procedure prescribed by the statute under consideration stand this test? What has been the course of proceeding

authorized by law when the state has sought to appropriate property for itself under all our Constitutions? The most extensive exercise of the right of eminent domain by the state was in the construction and enlargement of the Erie canal. That great undertaking was authorized by chapter 262 of the Laws of 1817, entitled " An act respecting navigable communications between the great western and northern lakes and the Atlantic ocean," the third section of which provides " that it shall and may be lawful for the said canal commissioners, and each of them, by themselves and by any and every superintendent, agent and engineer employed by them, to enter upon, take possession of and use all and singular any lands, waters and streams necessary for the prosecution of the improvements intended by this act, and to make all such canals, feeders, dykes, locks, dams and other works and devices as they may think proper for making said improvements, doing nevertheless no unnecessary damage ; and that in case any lands, waters or streams taken and appropriated for any of the purposes aforesaid, shall not be given or granted to the People of this state, it shall be the duty of the canal commissioners from time to time, and as often as they think reasonable and proper, to cause application to be made to the justices of the Supreme Court, or any two of them, for the appointment of appraisers," who, as the section further provides, are required " to make a just and equitable estimate and appraisal of the loss and damage, if any, over and above the benefit and advantage to the respective owners and proprietors or parties interested in the premises so required for the purposes aforesaid by and in consequence of making and constructing any of the works aforesaid." A similar provision was subsequently made for the taking of materials necessary to keep the canals in repair (L. 1820, ch. 202, § 3.) The act providing for the enlargement of the Erie canal, as well as those authorizing the construction of the numerous collateral canals, simply conferred upon the canal commissioners the power to " enter on and take possession of and use all lands, streams and waters, the appropriation of which for the

use of such canals and works shall in their judgment be necessary." (L. 1835, ch. 274, § 5; 1 R. S. 220, § 16; Id. 662, § 109.)

All the canals of the state were built under these acts, and much property of great value was appropriated solely under their provisions. For many years the powers thus conferred were in constant exercise, and although these statutes were often before the courts, not one was ever declared unconstitutional because of the summary method authorized in appropriating property. There was neither hearing nor notice, for the canal commissioners, or their agents, simply took possession of and used "all lands, streams and waters" which they deemed necessary for the use of the canals. This completed the condemnation, except that the damages when ascertained were paid by the state. Under some of the acts, if the property owners filed their claims within one year after the appropriation, they received the amount awarded by the appraisers, and unless they filed their claims within the period mentioned they received nothing in the absence of special legislation. Adjudications made many years ago, and acquiesced in ever since, sustained, some directly and others indirectly, the constitutionality of this legislation, and without further discussion we hold that the statute under consideration is not unconstitutional because it does not provide for condemnation by due process of law. (*Wheelock* v. *Young*, 4 Wend. 647; *Jerome* v. *Ross*, 7 Johns. Ch. 315; *Rogers* v. *Bradshaw*, 20 Johns. 735.)

Just compensation, to be ascertained in the absence of agreement by an impartial tribunal, is an absolute right belonging to the owner of the property taken, but it is not necessary to provide for payment in advance, if a certain, convenient and adequate source and means of payment is provided. A distinction is made between direct action by the state and action under power delegated to a corporation created by the state, as the one is presumed to be solvent while the other is not. Where, as in this case, the treasury of the state is pledged to meet the claim, payment need not be concurrent with the taking. (*Matter of Mayor, etc.*, 99 N. Y. 569.)

It is, however, contended, and the learned Appellate Division, by a majority vote, has so held, that the defendant, by filing its map and serving notice upon the occupants, acquired a lien, good even as against the state, which entitled it to notice and compensation as an owner.

The act under which the plaintiff proceeded provides for service upon and compensation to the owners only. (L. 1897, ch. 220, §§ 4 and 5.) It differs in these respects from the canal statutes above referred to, which provided for no service upon any one, but authorized " every person interested in premises so appropriated " to file a claim for compensation. (1 R. S. [6th ed.] 647, § 16, and 659, § 48.) The theory of the statute before us is, that money is substituted for land, for by the 19th section provision is made for liens and incumbrances by the deposit of the amount awarded to the claimant, " to be paid and distributed to the persons entitled to the same as directed by the judgment " of the Court of Claims. (L. 1897, ch. 220, § 19.) Whether this provision is in all cases adequate, inasmuch as it does not necessarily give the owner of a lien on the premises, created by contract, such as a mortgage, an opportunity to be heard as to the amount of compensation, it is unnecessary to now decide, for, as we think, the defendant, by merely filing its map and profile and serving notice on the occupants, acquired no lien and no property right as against the state.

The map was filed in 1897, when the defendant had 985 years of corporate existence before it, and it had then been relieved for all time by the action of the railroad commissioners from the obligation of extending its road. If a lien upon the real estate covered by the map was thus created, it was good for the long period named and was virtually a perpetual incumbrance placed upon the property, which impaired its value by hindering sales and preventing improvements, and yet the holder of the lien was neither obliged to do anything by virtue thereof for the benefit of the public, nor even to compensate the owner. No action had been taken or money expended to extend the road when the state acted. Did the state by creating the defendant and giving it the

power of eminent domain place in its hands a weapon to be used against itself? No argument is required to refute an absurdity. It may be said, however, that if the filing of a map created a lien good as against the state, it created one good as against the owner of the fee, with no obligation to make compensation, yet this would be a violation of the Constitution and it has been so adjudged by this court. (*Forster* v. *Scott*, 136 N. Y. 577.)

But assuming it to be a lien, or something in the nature of a lien, as it was created by statute and not by contract, it can be done away with by statute, without liability to make compensation, unless some vested right has accrued under it. Under a statute substantially like the one before us, so far as the point under consideration is concerned (L. 1836, ch. 242), it was held, in a well-considered case, that in proceedings to condemn land judgment creditors were not required to be made parties because they were in no sense owners; that upon completion of the proceedings and payment of the compensation to the owner, the right was acquired to possess and use the lands free from all judgment liens; that the lien of a judgment upon real estate is purely statutory and that it is within the power of the legislature to abolish it at any time before rights have become vested; that a provision causing the lien of a judgment, which has not ripened into a title, to be superseded by the taking of the land through the right of eminent domain, on payment of compensation to the owner of the land only, is valid. (*Watson* v. *N. Y. C. R. R. Co.*, 47 N. Y. 157.) In deciding that case Judge Rapallo said: " A judgment creditor of an owner has no estate or proprietary interest in the land. He stands wholly upon the law, which gives him a remedy for the collection of his debt by a sale of the land under execution, in case sufficient personal property of the debtor should not be found. This remedy is not secured by contract, but is purely statutory * * *. The duration of this lien and the mode of its enforcement and discharge are subjects which appertain to the laws for the collection of debts; and the rules upon those subjects have been

changed, from time to time, according to the will of the legis-
lature. The power of the legislature to regulate those mat-
ters cannot be doubted. Acts have been passed shortening
and lengthening the duration of the liens of existing judg-
ments, and even providing for their extinguishment without
any proceeding to which the judgment creditor was a party
* * *. It is clearly within the power of the legislature
to abolish the lien of all judgments at any time before rights
have become vested or estates acquired under them * * *.
This would be no greater exercise of power than the abolition
of the right of distress for rent, or of the lien of the landlord
on property taken in execution, or of the right of imprisoning
the debtor. Yet the validity of such laws has been fully
recognized even where they affected existing claims or judg-
ments. They do not take away property, or affect the obli-
gation of contracts, but simply affect legal remedies. There
can, therefore, be no doubt of the validity of a provision caus-
ing the lien of a judgment, not ripened into a title by a sale,
to be superseded by the taking of the land under proceedings
in exercise of the right of eminent domain, on payment of
compensation to the owner of the land. We think that the
act of 1836 had that effect." After analyzing the act which,
as already stated, is on all fours with the act under considera-
tion, the learned judge continued: " The whole amount of
this appraisement is directed to be paid to the owners. There
is no provision for assessing the value of the interest of the
owners, subject to the lien of judgments, or for retaining any
part of the value of the land as indemnity against such judg-
ments. The whole value must be paid to the owners, or
deposited in bank, and the owners are left to pay their own
debts. The act then states what right the company shall
obtain by virtue of such payment to the owners, and the order
made thereupon. On the completion of the proceedings, the
company is declared to be possessed of the land during its
corporate existence, with the right to use the same for the
purposes of the road. This declaration excludes the implica-
tion, that, after the owners have been compensated, the right

of any other person to interfere with the possession or use of the land is reserved, or that, in order to retain such use, the company is bound to satisfy liens of judgment creditors, after having been compelled to pay the whole value of the land to the owner. What recourse the judgment creditor might obtain in equity upon the proceeds paid to, or deposited to the credit of the owner, is a question not involved in this controversy ; neither is it necessary to consider how the rights of mortgagees would be affected by the proceeding, or what protection they could obtain. The matter of the lien of judgments being wholly under the control of the legislature, they had power to confer upon the company the right of possession and use of the land free from all such liens, on paying the value of the land to the owner ; and we think it was manifestly their intention so to do, modifying to that extent the laws giving liens to judgment creditors."

We can see no difference in principle between that case and this. Neither the lien of the judgment in that case, nor the pretended lien of the map in this, was created by contract, and no vested right had accrued under either. The state, therefore, had absolute control of the subject in the one case as much as the other. If there was any lien in the case before us it was created by statute and could be abolished by statute, either after the map was filed, or by doing away in advance with the ordinary effect of the map if filed after the passage of the act, which, when reasonably construed, in the light of the broad purpose to be accomplished, had that effect in this case the same as it had in the *Watson* case. See, also, *Moore* v. *City of New York* (8 N. Y. 110), where it is held that when lands are taken for public use under the power of eminent domain, upon payment of their value to the owner of the fee, the public acquires an absolute title divested of the wife's inchoate right of dower.

We do not think, however, that any lien, or any right in the nature of a lien, can be created as against the state by the simple filing of a map by a corporation organized to construct a railroad. As there is no language expressly giving it that

effect, in the nature of things the legislature did not intend to clothe a creature of the state with the right to hold up the paramount power and compel it to pay money for the bare filing of a map, which is not the commencement of condemnation proceedings, for it·is filed under the Railroad Law, while condemnation is had under the Code of Civil Procedure. (R. R. Law, § 6; Code Civ. Pro. §§ 3357, 3384.)  A proceeding cannot be held to be continuous when the first act may be done over nine hundred years before the second step is taken. Even if it were inchoate condemnation, it could not be used against the state, because a delegated power of eminent domain cannot be turned against the sovereign which conferred it and which is the source of all power.   What then, it may be asked, was the effect of filing the map, and what function did it perform ?   The effect of the map when filed was to give warning to other railroads ʼthat a certain route had been preempted by the defendant.   It established no right against the owner, because the Constitution forbids it; it established none against the state, because its power is paramount, but as against all other railroad companies and as against all other creatures of the state, empowered to use the right of eminent domain, it gave the exclusive right to occupy the particular strip of land for railroad. purposes until the legislature authorized it to be devoted to some other public use.

The general language used in certain cases relied upon by the defendant should be read in the light of the facts then before the court.  (*Rochester, H. & L. R. R. Co.* v. *New York, L. E. & W. R. R. Co.*, 110 N. Y. 128 ; *Suburban Rapid Transit Co.* v. *Mayor, etc.*, 128 N. Y. 510.)  These cases simply involved controversies between corporations created by the state as to a located line, the legislation necessary to enable one corporation to condemn land previously condemned by another and the like.   The state was not a party to any of them, and the only question involved was as to which corporation was ahead.   The so-called lien was simply an exclusive right of one of two contending railroad corporations, as against the other, to build a road on a certain piece of land, or of a

railroad corporation to hold land already condemned for a public use, as against a city seeking to condemn it for another public use, without special authority from the legislature. The general effect of filing a map was not involved, but the particular effect as between two corporations, each trying to get the same land. The paramount right of the state to modify statutes, before vested rights have been acquired under them, was not involved. Here the question arises between the state and one of its creatures, and the claim that a lien, good as against the creator of the corporation, was placed upon the land simply by the grant of a franchise to exist as a corporation in order to build a road, followed by the filing of a map of the proposed route and notice thereof to the occupants, but by nothing else, cannot be sustained. There is no property in a naked railroad route, existing on paper only, that the state is obliged to pay for when it needs the land covered by that route for a great public use, and its officers are authorized to act by appropriate legislation. (*Pearsall* v. *Great Northern Ry.*, 161 U. S. 646; *Bank of Commerce* v. *Tennessee*, 163 U. S. 416, 424; *Galveston, etc., Ry. Co.* v. *Texas*, 170 U. S. 226, 240; *Matter of Rensselaer & Saratoga R. R. Co.* v. *Davis*, 43 N. Y. 137; *Matter of Washington Park Commissioners*, 56 N. Y. 144; *N. Y. C. & H. R. R. R. Co.* v. *Aldridge*, 135 N. Y. 83; *Archibald* v. *N. Y. C. & H. R. R. R. Co.*, 157 N. Y. 574.)

That the use for which the land in question was appropriated is a public use cannot well be questioned. The object of the legislature was to create a great public park for the promotion not only of health and pleasure, but of commerce as well. The statute declares that it is " for the free use of all the people for their health and pleasure," as well as " the preservation of the head waters of the chief rivers of the state, and a future timber supply." (L. 1895, ch. 395, § 270.) The creation of the park is a part of the permanent policy of the state, for the people have embedded the project in the Constitution and have made the lands devoted to the purpose absolutely inalienable. (Const. art. 7, § 7.) The use is not restricted,

either by legislation or circumstances, to a special locality, or to a limited number of inhabitants, but is extended to all the people. If authorities are needed to show that property taken for a public park is taken for a public use, the following may be consulted: *Shoemaker* v. *U. S.* (147 U. S. 282); *Brooklyn Park Commissioners* v. *Armstrong* (45 N. Y. 234); *Matter of Central Park* (63 Barb. 282); Lewis Eminent Domain (§ 175); 10 Am. & Eng. Encyc. (2nd ed.) 1084.

Considering the language of the Constitution and statute, the situation, nature and object of the park, the constitutional inhibition against transferring any part of it, the well-known danger of destruction of forest lands by fires communicated by locomotives, and it is clear that the two uses, for such a park and for a railroad operated by steam, are inconsistent public uses which cannot stand together. The primary object of the park, which was created as a forest preserve, was to save the trees for the threefold purpose of promoting the health and pleasure of the people, protecting the water supply as an aid to commerce and preserving timber for use in the future. The command of the Constitution, that the lands of the forest preserve cannot be "taken by any corporation, public or private," shows an unmistakable intention to keep railroads out of the Adirondack park.

There are other questions in the case, but they cannot be discussed without unduly lengthening this opinion. After examining them all, we are of the opinion that the order appealed from should be reversed and the judgment entered upon the decision of the Special Term affirmed, with costs.

All concur (GRAY, J., in result, upon the ground that the act of 1897, under which the forest preserve board acted, was constitutional, and the state acquired the land in question by the exercise of a power which superseded any lien the defendant might have obtained by the initiatory steps taken, and HAIGHT, J., concurs in result).

Order reversed and judgment entered upon the decision of the Special Term affirmed.