DANIEL MORIARTY, Appellant, v PLANNING BOARD OF THE VILLAGE OF SLOATSBURG, Respondent.

Second Department, September 2, 1986

APPEARANCES OF COUNSEL

*Coral Ortenberg Mayer Zeck & Prier, P. C. (J. Martin Cornell* and *Reuben Ortenberg* of counsel), for appellant.

*Terry Rice* for respondent.

OPINION OF THE COURT

Lazer, J. P.

The question is whether site plan approval may be denied by a village Planning Board on the ground that fire protection will be inadequate because the closest fire hydrants are too distant from the site. We conclude that rejection on such a ground exceeds the site plan review powers of a village Planning Board.

The property involved is a vacant parcel of industrially zoned land in the Village of Sloatsburg upon which the owner proposes to erect a metal fabricating plant. Since the Sloatsburg Zoning Ordinance makes site plan approval by the Planning Board a prerequisite to the issuance of a building permit for such a use (Village of Sloatsburg Zoning Ordinance § 54-48 [E]; § 54-50), denial of approval is tantamount to denial of a building permit.

At the last of the Planning Board's several hearings relative to site plan approval for the parcel, the availability of fire protection emerged as the principal issue. The village fire chief and other fire officials declared that the nearest fire hydrant was 4,000 feet from the property, that if a fire did occur the assistance of four other local fire departments would be necessary, and a delay of 17 minutes would take place before water could be brought to the site. The owner's offer to install a 10,000 gallon water tank to permit the Sloatsburg Fire Department to contain a fire until assistance arrived was met with the fire officials' contention that even two such tanks would be insufficient. On the basis of these concerns, the Planning Board denied the owner's application for site plan approval.

In dismissing the proceeding for CPLR article 78 relief that followed, Special Term ruled that the Planning Board had acted reasonably in finding that the lack of an adequate water supply for fire protection warranted disapproval of the application. We view the issue differently; the question is not the reasonableness of the action but whether the Planning Board had the power to deny site plan approval because of the

excessive distance to the nearest water supply available for fire protection purposes. The answer to that question implicates both the nature of site plan review and how it interconnects with the municipal police power to regulate and restrict the use and development of real property.

A site plan is different from a subdivision plat because it usually involves the proposed development of a single lot intended to remain as such (2 Rathkopf, Zoning and Planning § 30.04 [1], at 30-13 [4th ed]), while a subdivision plat involves the division of a parcel into multiple lots *(Riegert Apts. Corp. v Planning Bd. of Town of Clarkstown,* 57 NY2d 206). " 'A site plan is a plan required to be submitted by the builder, showing the proposed location of the buildings, parking areas, and other installations on the plot, and their relation to existing conditions, such as roads, neighboring land uses, natural features, public facilities, ingress and egress roads, interior roads, and similar features' " *(Riegert Apts. Corp. v Planning Bd. of Town of Clarkstown, supra,* at p 211, quoting from 2 Rathkopf, Zoning and Planning § 30.04 [1], at 30-13— 30-14 [4th ed]; *see also, Matter of Gershowitz v Planning Bd.,* 69 AD2d 460, 473-474, *revd on other grounds* 52 NY2d 763). In essence, a site plan shows the proposed design and layout of the improvements to be placed on a parcel.

Site plan review is relatively new among the panoply of land regulatory devices and its emergence seems to be a consequence of the surge of land development that commenced in the 1950's. As the surge continued, the amount of land available for development diminished, the number of subdivisions declined, construction of shopping centers, office buildings and industrial structures burgeoned and complex multiuse development of single parcels increased *(see,* 1A Antieau, Municipal Corporation Law § 8A.28 [1986]). While the increased focus upon site plan review as a means of regulating and improving land use development *(see,* Cunningham, Stoebuck & Whitman, Property § 9.15 [1984]; Mandelker, Land Use Law § 6.63 [1982]; 2 Williams, American Land Planning Law § 152.01 [1985]) undoubtedly has many origins, its most likely sources seem to have been the vast expansion of public interest in environmental and aesthetic considerations, the need to increase the attractiveness of commercial and industrial areas in order to invite economic investment, and the traditional impulse for controls that might preserve the character and value of neighboring residential areas.

The grant of power to authorize administrative bodies to

review site plans and thereby to compel alteration of the plans represents a substantial increase in the municipal police power over the use and development of land. Site plan review permits municipalities to regulate the development and improvement of individual parcels in a manner not covered under the usual provisions of building and zoning codes which establish specific standards for construction of buildings, provide for specific limitations on use, and fix definite numerical criteria for density, building set backs and frontage and height requirements. *Euclidian* zoning concepts mandate that such zoning requirements be equally binding on all property in a particular zoning classification *(see, Euclid v Ambler Corp.,* 272 US 365). Since site plan review standards are almost entirely unsusceptible to being fixed in numerical terms, the power is always delegated in general, almost vague language that ultimately furnishes the municipal planning agency with the authority to impose restrictions that are more onerous than those contained in building and zoning codes and which differ from lot to lot.

From the outset, municipal Planning Boards have been regarded as the appropriate agencies to conduct site plan review. This relatively new function thus supplements the more traditional Planning Board roles of subdivision plat approval, the adoption of master plans and the rendering of advice to local governing bodies concerning proposed zoning changes *(see,* Yokley, *The Place of the Planning Commission and the Board of Zoning Appeals in Community Life,* 8 Vanderbilt L Rev 794). In this State, the initial conflicts involving site plan review concerned the nature of the function and the jurisdiction to conduct it. Although planning texts of the 1960's and early 1970's sometimes used the terms subdivision regulation and site plan review interchangably or failed to mention site plan review at all *(see, e.g.,* Claire, Urban Planning [1973]; Delafons, Land Use Controls in the United States [1962]; Goodman & Kaufman, City Planning in the Sixties [1965]), by 1962, New York courts were confronted with issues concerning the nature of site plan review and its relationship to the established concept of subdivision regulation. In that year, this court held that subdivision plat approval and site plan approval were two different concepts and therefore a Planning Board could approve a site plan without a public hearing, even though the statute authorizing subdivision approval required such a hearing *(see, Matter of Cedar Lane Hgts. Corp. v Marotta,* 17 AD2d 651). Although *Cedar*

*Lane* did not address the genesis of Planning Board power to pass upon site plans, we subsequently held that the authority for site plan review derived from a statute that authorized that matters be referred to a Planning Board for advisory purposes *(see, Matter of Thurman v Snowden,* 28 AD2d 705) and, pursuant to that theory, we declared in dictum that still survives, that the only power a Town Board could delegate to a Planning Board with respect to site plan review was the power to make advisory recommendations, not the power to grant or deny approval *(see, Nemeroff Realty Corp. v Kerr,* 38 AD2d 437, *affd* 32 NY2d 873).

Shortly after *Nemeroff (supra)* was decided in 1972, the Legislature granted explicit authority to several municipalities to delegate final site plan approval power to Planning Boards *(see,* L 1974, ch 788 [municipalities in Westchester County]; L 1974, ch 787 [Town of Clarkstown]; L 1975, ch 235 [Town of Orangetown]; L 1975, ch 236 [Town of Ramapo]). To permit other municipalities to delegate the power and to eliminate various mechanisms local authorities had employed to effectuate the delegation *(see, Holmes v Planning Bd.,* 78 AD2d 1, 12), the Legislature subsequently repealed the piecemeal legislation and granted all cities, towns and villages identical authority to delegate site plan approval power to Planning Boards (L 1976, ch 272, adding General City Law § 30-a; Town Law § 274-a; and Village Law § 7-725). While the power to conduct site plan review was one that local legislative bodies possessed before the enabling legislation was enacted *(see, Matter of Pittsford Plaza Assoc. v Spiegel,* 66 NY2d 717), it was the enabling legislation that made the power a meaningful one by permitting its delegation to an administrative body.

Village Law § 7-725 (1) (a) authorizes village Boards of Trustees to delegate the power over site plan approval to a Planning Board and include for review by the Planning Board the arrangements, layout and design of the site plan, including: "parking, means of access, screening, signs, landscaping, architectural features, location and dimensions of buildings, impact of the proposed use on adjacent land uses and such other elements as may reasonably be related to the health, safety and general welfare of the community" (Village Law § 7-725 [1] [a]).

Sloatsburg reacted to the Legislature's enabling statute by adopting an ordinance which delegated site plan approval

power to the Planning Board and provided that in the course of such review the Planning Board was to make findings with respect to traffic access, circulation and parking, landscaping and screening, and to "take into consideration the public health, safety and general welfare, the comfort and convenience of the public in general and of the residents of the immediate neighborhood in particular, and attach such conditions and safeguards as a precondition to approval of the said plan as in its opinion will further the general purpose and intent of this ordinance and be in harmony therewith" (Village of Sloatsburg Zoning Ordinance § 54.50 [C]). The Planning Board was further directed to consider "the relationship between the principal building and structure and uses; the convenience and safety of the parking and loading areas and the interior circulation systems and the access to public streets; the adequacy of walkways between principal buildings and accessory structures and uses, including parking areas; the adequacy of landscaping and lighting features to screen adjacent residential areas and streets from any potential nuisance features of the use of the parcel, and such other criteria as directly relate to the health, safety and general welfare of the surrounding community" (Zoning Ordinance § 54-48 [E] [3] [A]).

It was in the purported exercise of this power that the Sloatsburg Planning Board voted to deny site plan approval to the instant appellant, not because of any perceived design deficiencies, but because of the lack of nearby public water for fire protection purposes, a factor unmentioned in the State enabling statute or the derivative sections of the Sloatsburg Zoning Ordinance. For fire prevention purposes, the adequacy of the water supply in Sloatsburg is regulated by the New York State Uniform Fire Prevention and Building Code (9 NYCRR part 600 *et seq.*) which has been adopted by the village as its local building and fire code (Local Laws, 1984, No. 4 of Village of Sloatsburg). Under that State code, if the water supply is not adequate for fire protection, a yard hydrant system may be installed to allow the building to "be reached by an effective stream of water with hose not exceeding 500 feet in length" (9 NYCRR 1060.6 [c]; 774.6). Under the code and the local law adopting it, the building inspector must deny a building permit if proposed construction does not meet code requirements (9 NYCRR 760.1; Local Laws, 1984, No. 4 of Village of Sloatsburg). In this case, it was the Planning Board's action which precluded issuance of a building permit

based on the distance from fire hydrants, and it is the Planning Board's power to do so that is the issue.

Arguing for affirmance, the Sloatsburg Planning Board contends that it has the power to reject site plans because of fire hydrant considerations since, in addition to the design and layout factors it enumerates, the State enabling legislation authorizes consideration of "such other elements as may reasonably be related to the health, safety and general welfare of the community" (Village Law § 7-725 [1] [a]). Since the quoted language also appears in the Sloatsburg Zoning Ordinance, resolution of the appeal largely turns on the meaning and significance of that general terminology.

It hardly bears repetition to note that in the construction of statutes legislative intent is the great and controlling principle (see, Sega v State of New York, 60 NY2d 183, 191; Eaton v New York City Conciliation & Appeals Bd., 56 NY2d 340, 345; Matter of Petterson v Daystrom Corp., 17 NY2d 32), the judicial function being to ascertain and give effect to that intention (McKinney's Cons Laws of NY, Book 1, Statutes § 92). To achieve that result, consideration must be given to the language employed (see, Finger Lakes Racing Assn. v Western Regional Off-Track Betting Corp., 45 NY2d 471, 479-480; Matter of Albano v Kirby, 36 NY2d 526, 530) as illuminated by the purpose sought to be furthered by the legislation (Matter of Pell v Coveney, 37 NY2d 494, 496; see, Matter of Allstate Ins. Co. v Shaw, 52 NY2d 818), the legislative history of the act (Matter of Action Elec. Contrs. Co. v Goldin, 64 NY2d 213, 221), and the established canons of statutory construction (Matter of Thomas v Bethlehem Steel Corp., 95 AD2d 118, affd 63 NY2d 150; McKinney's Cons Laws of NY, Book 1, Statutes § 91). Here, it was plainly the intent of the Legislature to meet local needs for further controls on the improvement of individual lots through the medium of Planning Board review of the design and layout of such improvements. The language employed enumerated the various design and layout factors which the Planning Board could consider and appended a reference to the health, safety and general welfare of the community. How that appendage affects the totality of the power delegated is the narrower problem before us.

What the enabling legislation delegated was the power to regulate land use—clearly a police power (Euclid v Ambler Corp., 272 US 365, 387, supra; Matter of New York Inst. of Technology v Le Boutillier, 33 NY2d 125, 130). The police

power is, of course, an inherent attribute of the State as sovereign *(People v Adirondack Ry. Co.,* 160 NY 225, 236, *affd* 176 US 335), which has been reposed in the Legislature (NY Const, art III, § 1). Its exercise by a municipality requires a delegation in the form of enabling legislation which defines the extent to which the police power may be exercised *(Matter of Kamhi v Planning Bd.,* 59 NY2d 385, 389). The Legislature's delegation of the power to regulate land use to all of the municipalities of the State is long standing *(see,* General City Law § 20 [24], L 1913, ch 247, as added by L 1917, ch 483; General City Law art 5-A, added by L 1920, ch 743; Town Law art 16, added by L 1932, ch 634), and it has often been construed. At issue here is a new addition to the police power which in the ultimate authorizes administrative agencies to impose further restrictions on the development of land.

Zoning laws are by their very nature in derogation of common-law property rights and thus are subject to the long-standing rule requiring their strict construction *(see, FGL & L Prop. Corp. v City of Rye,* 66 NY2d 111, 115; *see also, Thomson Indus. v Incorporated Vil. of Port Wash. N.,* 27 NY2d 537, 539; *Matter of 440 E. 102nd St. Corp. v Murdock,* 285 NY 298, 304). In the instant case the force of that rubric is somewhat muted by the fact that the real issue before us is the extent of a particular delegation of police power. Whether such a delegation is subject to strict or liberal construction remains a matter of some debate *(see,* 6 McQuillin, Municipal Corporations § 24.39 [3d ed 1980]). In this State, the traditional view was that statutes that delegated legislative power were to be strictly construed and in the absence of clear and definite language establishing a delegation none was to be found *(see, Matter of Ocean Beach Ferry Corp. v Incorporated Vil. of Ocean Beach,* 298 NY 30, 36; *Matter of Quinby v Public Serv. Commn.,* 223 NY 244, 263). More recently, however, the Court of Appeals has not reiterated that view *(see, e.g., Matter of City of New York v State of New York Commn. on Cable Tel.,* 47 NY2d 89, 92; *Finger Lakes Racing Assn. v Western Regional Off-Track Betting Corp.,* 45 NY2d 471, 480, *supra)* and seems to have veered to a more neutral course, stating in two recent cases that the language of such delegating acts is to be given its "natural and ordinary meaning" *(see, Matter of Kamhi v Planning Bd.,* 59 NY2d 385, 391, *supra; Riegert Apts. Corp. v Planning Bd. of Town of Clarkstown,* 57 NY2d 206, 209, *supra).* This apparently less restrictive attitude may reflect judicial efforts to conform to various public policy

expressions intended to expand municipal home rule powers *(see,* NY Const art IX, eff Jan. 1, 1964; Municipal Home Rule Law, added by L 1963, ch 843, eff Jan. 1, 1964; Statute of Local Governments, added by L 1964, ch 205, eff July 1, 1965), although at least one recent commentator has questioned whether the empirical results have matched expectations *(see,* Cole, *Constitutional Home Rule in New York: "The Ghost of Home Rule",* 59 St. John's L Rev 713 [1985]).

In any event, there is no escape from the fact that most of the cases dealing with land use regulation indicate a fairly restrictive interpretation of delegated powers. Thus, it has been consistently held that each local agency involved in the zoning and planning process may not exceed the bounds of the power specifically delegated to it. A Town Board may not review a Planning Board's denial of site plan approval *(Matter of Boxer v Town Bd.,* 60 AD2d 913), nor may a village Board of Trustees consider an appeal from the granting of a building permit by a building inspector, since the Legislature has delegated that power to the Board of Appeals *(113 Hillside Ave. Corp. v Village of Westbury,* 27 AD2d 858; *Matter of Kalen v Amato,* 248 App Div 777). In the absence of an administrative determination to review, a Zoning Board of Appeals is without power to grant a variance since its jurisdiction is appellate only *(Barron v Getnick,* 107 AD2d 1017); it may not entertain an appeal from a determination of the village Board of Trustees *(Matter of Katz v Board of Appeals,* 21 AD2d 693) and it may not use its variance power to rezone property since that legislative power has not been delegated *(Matter of Levy v Board of Stds. & Appeals,* 267 NY 347; *Matter of Giuntini v Aronow,* 92 AD2d 548), or to approve a subdivision plat, since that is a matter within the province of the Planning Board *(Van Deusen v Jackson,* 35 AD2d 58, *affd* 28 NY2d 608).

Planning Boards are obviously subject to the same rules of construction. A Planning Board is without authority to require the delivery of land for parks or money-in-lieu-of-land as a condition of site approval, since the power to make such an exaction is contained in the delegation of subdivision approval power but not in the site plan review legislation *(Riegert Apts. Corp. v Planning Bd. of Town of Clarkstown,* 57 NY2d 206, *supra).* Nor may a Planning Board exceed its power to vary zoning regulations under Town Law § 281 by demanding conveyance of land for park use. Indeed, a Planning Board may not vary zoning regulations at all without explicitly

being delegated such power *(Matter of Johnson v Moore,* 13 AD2d 984), nor may it deny site plan approval on the ground that the proposed use is not permitted under the zoning ordinance because the power to interpret the zoning ordinance is vested in the building inspector and the Zoning Board of Appeals *(see, Matter of Mialto Realty v Town of Patterson,* 112 AD2d 371, *lv dismissed* 66 NY2d 696; *Rattner v Planning Commn.,* 103 AD2d 826; *Matter of Gershowitz v Planning Bd.,* 69 AD2d 460, *revd on other grounds* 52 NY2d 763, *supra).*

Turning to the instant legislation, the critical language to be construed is the general welfare terminology included in the statute. Since that language does not stand alone, our understanding of its "natural and ordinary meaning" requires consideration of another rule of statutory construction that is called *ejusdem generis* and which remains quite alive and well despite its ancient origins *(see, Archbishop of Canterbury's Case,* 2 Coke, 46a; *Lyndon v Standbridge,* 2 K & N, 51; *Regina v Edmundson,* 2 E & E, 77, 83; *Gibbs v Lawrence,* 30 L J Ch, 170). Under *ejusdem generis,* the court is required to limit the general language of a statute by the specific phrases which have preceded it *(People v Illardo,* 48 NY2d 408, 416). The general words "are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words" (2A Sutherland, Statutory Construction § 47.17, at 166 [Sands 4th ed]). The general language is known "by the company it keeps", and even though the language might be capable of wider significance standing alone, "it is limited in its effect by the words to which it is adjunct. It may strengthen the general structure, but it cannot exceed the original outline" (McKinney's Cons Laws of NY, Book 1, Statutes § 239). In the context of municipal law, the canon has long been applied to limit general welfare clauses of the type that concerns us here to matters similar in kind to those which are enumerated *(see,* 2 Dillon, Municipal Corporations § 585, at 921 [5th ed 1911]; 6 McQuillin, Municipal Corporations § 24.45 [3d ed 1980]). *Ejusdem generis* has been utilized to such an extent in recent years that one commentator has noted that the general welfare clause has been "rendered insignificant" by it (1 Antieau, Municipal Corporation Law § 5.07, at 5-19).

The New York courts have construed numerous health, safety and general welfare provisions narrowly on the basis of the *ejusdem generis* principle. In *Matter of Golden v Planning Bd.* (30 NY2d 359, 370-371) the court declared that the delega-

tion of police power, even if couched in the broadest terms, could not be read as conferring the entire police power of the State. Although the general section that confers zoning power upon Town Boards (Town Law § 261) commences with a strong enunciation of its general welfare purposes, *Riegert Apts. Corp. v Planning Bd. of Town of Clarkstown* (57 NY2d 206, *supra)* held the power to be limited by the more specific purposes enumerated in the section. *Riegert* involved the Town Law site plan review provision which contains the identical health, safety and general welfare language found in the corresponding provision of the Village Law *(see,* Town Law § 274-a). In the Court of Appeals, Clarkstown relied on that language to support the legality of its effort to extract park fees from a developer as a condition of site plan approval but the court refused to read the language "so broadly" as to permit the enumerated powers to be expanded *(Riegert Apts. Corp. v Planning Bd. of Town of Clarkstown, supra,* at p 212). Even a general delegation of the power to enact ordinances desirable for the "health of the inhabitants" did not permit a village to restrict the performance of abortions to hospitals, because the grant could not include the entire police power of the State and was limited to matters of an inherently local nature *(Robin v Incorporated Vil. of Hempstead,* 30 NY2d 347, 350; *see also, Matter of Bon-Air Estates v Building Inspector of Town of Ramapo,* 31 AD2d 502; *People ex rel. City of New York v New York Rys. Co.,* 217 NY 310). Indeed, there is something redundant about the use of general welfare language in police power legislation because such power must always be granted and exercised for the protection of health, safety, or at least, the general welfare *(see, D'Angelo v Cole,* 67 NY2d 65; *Matter of Wulfsohn v Burden,* 241 NY 288, 298). That is not to say that general welfare language is wholly useless; it may assist in limiting the need to spell out every contingency *(see, People v Illardo,* 48 NY2d 408, 416, *supra)* and thus strengthen the general structure.

In sum, construction of the health, safety and general welfare provision in the instant enabling legislation (Village Law § 7-725 [1] [a]) is limited by its relation to the specific factors a Planning Board may consider with respect to site plan review. The provision does not constitute a grant of the entire police power of the State nor even of the entire power to regulate land use; it confers on the Planning Board no authority to regulate matters beyond the obvious purpose of the legislation. When the Legislature reacted to certain local

land use problems by authorizing Planning Boards to pass upon the layout, design and related aspects of proposed development, it did not authorize Planning Boards to assume the powers of building or fire inspectors to deny building permits because of fire protection concerns. Therefore, the Planning Board exceeded its powers when it denied site plan approval on a ground that only the building or fire inspector might have invoked. Accordingly, the determination must be annulled and the matter remitted to the Planning Board for further consideration and action within the limits of its power.

THOMPSON, RUBIN and KUNZEMAN, JJ., concur.

Judgment of the Supreme Court, Rockland County, dated February 15, 1985, reversed, on the law, without costs or disbursements, determination of the Planning Board of the Village of Sloatsburg, dated September 5, 1984, annulled, and matter remitted to the Planning Board of the Village of Sloatsburg, for further proceedings consistent herewith.