THE ASSOCIATION FOR THE PROTECTION OF THE ADIRONDACKS and Another, Plaintiffs, *v.* ALEXANDER MACDONALD, Conservation Commissioner of the State of New York, and Another, Defendants.*

Third Department, January 15, 1930.

*Schurman, Wiley & Willcox* [*Jacob Gould Schurman, Jr., George Welwood Murray, Samuel H. Ordway* and *Alanson W. Willcox* of counsel], for the plaintiffs.

*Hamilton Ward, Attorney-General* [*C. S. Ferris, Assistant Attorney-General*, of counsel], for the defendants.

*Lewis, Garvin & Kelsey* [*Wallace T. Stock, Frederick T. Kelsey* and *John W. De Witt* of counsel], as *amicus curiæ*, representing the Public Park and Playgrounds District of the Town of North Elba, Essex County, N. Y.

HINMAN, J. The "Forest Preserve" was created in 1885. Chapter 283 of the Laws of 1885 provided that "All the lands now owned or which may hereafter be acquired by the State of New York within" certain counties, including Essex county, "shall constitute and be known as the Forest Preserve." At that time the State owned 681,374 acres within those counties. It was provided that said lands should be forever kept as wild forest land and should not be sold, leased or taken by any person or corporation, public or private. A Forest Commission to be appointed by the Governor was created to care for the Forest Preserve. Chapter 37 of the Laws of 1890 authorized the Forest Commission to purchase such lands within the Forest Preserve as would be available for the purpose of a State park. In 1892 a park known as the "Adirondack Park" was established within certain of the forest preserve counties, including Essex county, and it was declared that such park shall be "forever reserved, maintained and cared for as ground open for the free use of all the people for their health and pleasure, and as forest lands necessary to the preservation of the headwaters of the chief rivers of the State, and a future timber supply." (Laws of 1892, chap. 707.) A tendency to sell or lease such Forest Preserve lands by legislative authority early became evident. (Laws of 1887, chap. 475, amdg. Laws of 1885, chap. 283, § 8; Laws of 1892, chap. 707, § 9.) Chapter 332 of the Laws of 1893 revised and consolidated the preceding acts and gave to the Forest Commission greatly enlarged powers, including authority for the sale of certain timber standing in any part of the Forest Preserve, the sale of such Forest Preserve lands as, in the

opinion of the Commission, were not needed to promote the purpose of the Forest Preserve, the lease of camp sites in the Forest Preserve, the laying out of paths and roads in the park, and the sale of certain standing timber, the fallen timber and the timber injured by blight or fire on any of the State forest lands.

This was the legislative policy of the State in 1894, when the Constitutional Convention met. At that time the State owned 731,459 acres in the Forest Preserve counties, of which 551,093 were within the Adirondack Park. In 1928 there were inside the Adirondack Park 1,595,514 acres and outside such park 355,889 acres owned by the State, making a total of 1,941,403 acres within the Adirondack Forest Preserve.

The Constitution of 1894, which went into effect on the 1st day of January, 1895, established a new policy. It was provided in the fundamental law that "The lands of the State, now owned or hereafter acquired, constituting the Forest Preserve as now fixed by law, shall be forever kept as wild forest lands. They shall not be leased, sold or exchanged, or be taken by any corporation, public or private, nor shall the timber thereon be sold, removed or destroyed." (Const. art. 7, § 7.) We may study the records of the Convention for aid in determining the meaning of this provision. (*Matter of Dowling*, 219 N. Y. 44.) Such study makes it clear that one purpose of the framers was to preserve the timber " intact." The special committee of the Convention, which formulated the amendment, so stated in its report. Mr. Choate asked the chairman of the committee: " Whether the scope of the amendment as it stands is that in no event could the Legislature authorize a railroad or highway to be built through these forests while the amendment lasts? " The reply was: " I think so, sir." He added: " I would say, Mr. Chairman, in answer to the question that the scope of the matter, as it is amended, is to prevent its being taken by any corporation, public or private." The proposal of the committee was thereafter amended in the Convention by the addition of the words " removed or destroyed " after the phrase " nor shall the timber thereon be sold." The Convention rejected a proposed amendment adding the words " except that fuel may be sold to State lessees or residents within such park." The chairman of the committee said: " We think it would be exceedingly dangerous to allow the Commission to sell timber for camp-fires. Any campers that cannot pick up something on the shores, that will not be timber, to warm themselves with, would better either carry in their fuel or stay out. It would be opening the door to a great danger." Another member of the committee stated: " The moment you put in any provision that

anybody can cut timber there, then you destroy the effect of the whole amendment." The possible " thinning out " of the forests on future scientific advice was discussed, and it was said: " no man has yet found it possible to improve upon the ways of nature." Destruction of trees by flooding, through the erection of dams, was decried and was one of the reasons suggested for adding the word " destroyed " to the amendment. The Forest Preserve was spoken of primarily as a great water supply and also as a vast sanitarium where thousands go to have their health restored and their vigor renewed. Mr. Brown stated to the Convention: " I say, sir, it is necessary to close the door unless you want this great water supply, this great sanitarium, this great health resort of our State that is known from ocean to ocean, and from land to land, destroyed, that you must shut the door, and you must close it tight, and close it right away." Other amendments to the clause proposed by the committee were advocated by delegates, but were rejected — one for exchange of lands; another authorized the Legislature " by suitable laws," to provide for the preservation and protection of the forest; another excepted certain lands; and another proposed to insert after the word " leased " the words " otherwise than is now provided by law." The Convention deliberately chose to perpetuate the Forest Preserve as just " wild forest lands." Not a door was permitted to be open which might convert this preserve into anything but a wilderness. Hampering limitations were rejected. To " shut the door " and " close it tight," the Convention provided: " nor shall the timber thereon be sold, *removed or destroyed.*" (See 1 Revised Record 1894 Const. Convention, 1201; 4 id. 124–163, 705–709.)

Three amendments have since been added to this section of the Constitution. In 1913 the People voted to amend it by adding the provision that " The Legislature may by general laws provide for the use of not exceeding three per centum of such lands for the construction and maintenance of reservoirs for municipal water supply, for the canals of the State and to regulate the flow of streams." In 1918 it was further amended to provide for the construction of a State highway from Saranac Lake to Old Forge. In 1927 it was again amended to provide for a State highway in Essex county from Wilmington to the top of Whiteface Mountain.

Other alterations of this constitutional provision have been attempted but have not been sanctioned. The Constitutional Convention of 1915 incorporated the 1894 provision verbatim except that it added the words " trees and " before the word " timber " and then expressly added provisions for reforestation, for the construction of fire trails, for the removal of dead trees and dead timber for reforestation and fire protection solely, and

for the construction of a State highway from Long Lake to Old Forge. The members of that Convention, many of whom were the ablest constitutional lawyers of the State, apparently deemed it necessary to add such provisions in order to accomplish the declared objects. The debates of the Convention fail to reveal any argument to the contrary. (See 2 Revised Record 1915, Const. Convention, 1445–1456, 1460–1499, 1501–1540.) Several Legislatures have on various occasions considered that amendments of the Constitution were necessary to authorize the leasing of camp sites, the removal of dead, burned and fallen timber and the construction of roads and trails for protection against fire and for ingress and egress.

There is but little aid given to us by previous judicial discussion of the constitutional provision in question. In *People* v. *Adirondack Railway Co.* (160 N. Y. 225; affd., *sub nom. Adirondack Railway Co.* v. *New York State*, 176 U. S. 335) the court held that the construction of a railroad was an inconsistent public use of the State's land in the Forest Preserve. *People* v. *New York Central & H. R. R. R. Co., No. 2* (161 App. Div. 322) and *People* v. *New York Central & H. R. R. R. Co.* (155 id. 699; revd., 213 N. Y. 136, 649) simply dealt with the proper measure of damages to be applied where timber upon the Forest Preserve was negligently burned. In *Newcombe* v. *Ostrander* (66 Misc. 103; affd., 140 App. Div. 945), involving the construction of a will dealing with "wild and forest lands," reference was made to the constitutional provision as to "wild forest lands" and to previous constructions by Attorneys-General that such lands belonging to the State "cannot be cleaned up, and burned or decayed timber cannot be taken therefrom." Mr. Justice VAN KIRK, then sitting at Special Term, added: "This is, in all probability, the construction of the constitutional provision which is in accord with its true meaning, and we believe it will be upheld by the courts."

From 1895 to 1919 successive Attorneys-General have uniformly given opinions advising strict constitutional construction against cutting timber belonging to the State in the Forest Preserve; against removal of burned timber; against road building where the cutting of timber was involved; against the cutting away of a ledge of rock in the Forest Preserve, in improving an existing highway. In 1919, however, the Attorney-General did give an opinion that six trees could properly be cut but it was in connection with the straightening out of an existing road. (1919 Op. Atty.-Gen. 266.) And in 1921 the same Attorney-General was of the opinion that trees could properly be cut for the construction of new roads and the improvement of existing ones, on the ground that authority to do so existed prior to 1894, and had not been

expressly abrogated by the Constitution. (1921 Op. Atty.-Gen. 130.) His liberal interpretation related solely to highway construction and is counter to the uniform trend of authority of his predecessors in office. In 1927 the Attorney-General sanctioned the cutting of dead seedlings from reforestation plantations on the Forest Preserve lands on the ground that the seedlings being only a half inch in diameter were not timber and that the places where they were set out did not constitute forests. (1927 Op. Atty.-Gen. 252.)

The constitutional mandate is clear. If, however, there are doubtful questions which might arise under this mandate, particularly as to legislation or acts of the Conservation Department looking solely to the preservation of the character of the Preserve as wild forest lands or to the prevention of their destruction as such by fire or otherwise, such doubt does not exist here. The foregoing consideration of the history and strict interpretation of the mandate for many years cannot be disregarded. (*People ex rel. Cotter* v. *Gilbert*, 226 N. Y. 103, 107.) Statutes relied on by counsel which deal with safeguarding these forests, covering such projects as fire observation towers, fire lanes, and even the laying out of roads and paths, which do not necessarily involve the cutting of timber, do not sustain the construction of a bobsleigh run involving the conceded cutting of 2,600 trees. Chiefly counsel have sought to justify a bobsleigh run because it will tend to carry out one of the conceded purposes of the Forest Preserve, namely, a park " open for the free use of all the people for their health and pleasure." (Laws of 1892, chap. 707, § 1; Laws of 1895, chap. 395, adding to former Fisheries, Game and Forest Law, § 290; *People* v. *Adirondack Railway Co.*, 160 N. Y. 225, 248.) By various amendments and revisions of the statutes the Adirondack Park is now " forever reserved and maintained for the use of all the people." (See Conservation Law, § 62, subd. 2, as added by Laws of 1916, chap. 451; now § 63, subd. 2, as renum. and amd. by Laws of 1928, chap. 242.) Giving to the phrase " forever kept as wild forest lands " the significance which the term " wild forest " bears, we must conclude that the idea intended was a health resort and playground with the attributes of a wild forest park as distinguished from other parks so common to our civilization. We must preserve it in its wild nature, its trees, its rocks, its streams. It was to be a great resort for the free use of all the prople, but it was made a wild resort in which nature is given free rein. Its uses for health and pleasure must not be inconsistent with its preservation as forest lands in a wild state. It must always retain the character of a wilderness. Hunting, fishing, tramping, mountain climbing, snowshoeing, skiing or

skating find ideal setting in nature's wilderness. It is essentially a quiet and healthful retreat from the turmoils and artificialities of a busy urban life. Breathing its pure air is invigorating to the sick. No artificial setting is required for any of these purposes. Sports which require a setting that is man-made are unmistakably inconsistent with the preservation of these forest lands in the wild and natural state in which Providence has developed them. This bobsleigh run and return-way require the clearing of four or five acres of forest lands, the cutting of 2,600 trees which must unquestionably be regarded as of " timber " size and the blasting of some fifty cubic yards of rock from their natural state, to say nothing of the cuts and fills of earth and rock which will be required to make the slide an even and safe surface for the sport and the return-way possible up a steep slope to the top of the slide. If clearings of timber from lands owned by the State in the Forest Preserve are sanctioned for such a purpose, they are equally sanctioned for the construction of public automobile race tracks, toboggan slides, golf courses, baseball diamonds, tennis courts and airplane landing fields, all of which are out of harmony with forest lands in their wild state. There will be no limit to such encroachments that will crowd through the door of such precedent, if established. As we view it, the Legislature has no power to open that door. If the People desire to use their great park for such recreation a constitutional amendment is necessary. It may be too late to avail in the case of this bobsleigh run, in time for the projected Olympic Games, but the argument for selecting a site on State lands rather than at Mt. Jo on privately owned lands is only one of expediency. It is easier and cheaper to construct and slightly more accessible. These of course are not considerations having any weight in the determination of the constitutional question involved.

The question submitted should be answered in the affirmative, and judgment rendered in favor of the plaintiffs, as prayed for, without costs.

VAN KIRK, P. J., DAVIS, HILL and HASBROUCK, JJ., concur.

Question submitted answered in the affirmative, and judgment rendered in favor of the plaintiffs against the defendants, without costs, ordering and decreeing that the defendants, and each of them, their agents or employees, be permanently enjoined and restrained from constructing and maintaining a bobsleigh run or slide, including a way for returning such sleighs to the top, on State lands in the Forest Preserve, on the ground that the statute purporting to confer authorization therefor is unconstitutional and void.