# State of New York Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 21
Protect the Adirondacks! Inc.,
   Respondent-Appellant,
     v.
New York State Department of
Environmental Conservation et
al.,
   Appellants-Respondents.

Jennifer L. Clark, for appellants-respondents.
John W. Caffry, for respondent-appellant.
Sierra Club; Adirondack Association of Towns and Villages, Inc. et al.; Empire State Forest Products Association, Inc.; Open Space Institute, Inc. et al.; Adirondack Council, Inc. et al.; The Nature Conservancy, amici curiae.

RIVERA, J.:

On this appeal, we must determine whether the state's plan for the construction of

approximately 27 miles of Class II community connector trails designed for snowmobile

- 1 -

use in the Forest Preserve is permissible under the New York Constitution. The plan requires the cutting and removal of thousands of trees, grading and leveling, and the removal of rocks and other natural components from the Forest Preserve to create snowmobile paths that are nine to 12 feet in width. We conclude that construction of these trails violates the "forever wild" provision of the New York State Constitution (art XIV, § 1) and therefore cannot be accomplished other than by constitutional amendment.

I

The Adirondack Park currently encompasses approximately six million acres of public and private lands. The Forest Preserve encompasses 2.5 million acres of State-owned land within the Park. Defendant New York State Department of Environmental Conservation (DEC) was established in 1970, with a mandate to "[p]rovide for the care, custody, and control of the forest preserve" (ECL 3-0301 [d], 3-0101; *accord* ECL 9-0105 [1] [granting DEC authority and duty to take "care, custody and control of the several preserves, parks and other state lands described in this article"]). Defendant Adirondack Park Agency (APA) is concerned with "developing long-range park policy" to advance "optimum overall conservation, protection, preservation, development and use of the unique scenic, aesthetic, wildlife, recreational, open space, historic, ecological and natural resources of the Adirondack park" (Executive Law § 801). The DEC, in consultation with APA, develops individual management plans for units of land classified in a master plan,

which "shall guide the development and management of state lands in the Adirondack park" (*id.* § 816 [1]).

In 2006, the Department of Environmental Conservation (DEC) and the New York State Office of Parks, Recreation and Historic Preservation prepared a "conceptual snowmobile plan" with the goal of creating a system of snowmobile trails between communities in the Adirondack Park. In 2009, DEC developed a guidance document, entitled "Management Guidance: Snowmobile Trail Siting, Construction and Maintenance on Forest Preserve Land in the Adirondack Park," to implement the concepts outlined in the plan. Under the guidance, the "multi-use" snowmobile trails are meant to improve community connections, but are also intended for more "passive recreational uses," including hiking, mountain biking and other "non-motorized recreational pursuits in the spring, summer and fall." Trails in the park that are open to snowmobiles are classified as either Class I secondary snowmobile trails or Class II trails, the type at issue in this appeal. Class II trails are "trail segments that serve to connect communities and provide the main travel routes for snowmobiles."

Protect the Adirondacks! Inc. commenced this combined declaratory judgment action and article 78 proceeding, alleging, in relevant part, that construction of the Class II trails violated article XIV, § 1, of the New York Constitution. Plaintiff alleged that the construction of the trails is impermissible because it required cutting and destruction of a substantial amount of timber, would create an "artificial man-made setting" in the Forest Preserve and was inconsistent with the Preserve's wild forest nature. After a bench trial Supreme Court held that the construction was not unconstitutional.

The Appellate Division reversed with one Justice dissenting (175 AD3d 24 [3d Dept 2019]). The majority adopted a bifurcated analysis of the constitutional provision and held that construction in the Forest Preserve of the Class II trails did not violate the "forever wild" clause because the qualities of the trails—"which have similar aspects to foot trails and ski trails and have less impact than roads or parking lots"—do not "impair[]" the wild forest nature of the Forest Preserve (*id.* at 29). Nevertheless, the Appellate Division held that the trail construction constitutes an unconstitutional destruction of timber (*id.* at 29-31). The dissent would have held that the construction of the Class II trails "effect a reasoned balance between protecting the Forest Preserve and allowing year-round access" (*id.* at 32 [Lynch, J., dissenting]).

Defendants appeal, and plaintiff cross-appeals, as of right (*see* CPLR 5601 [b]).[1] We now affirm and hold that the planned construction of the Class II community connector trails would violate the constitution.

II

The Forest Preserve is a publicly owned wilderness of incomparable beauty. Located in two regions of the Adirondack and Catskill Mountains, the Forest Preserve— with its trees, rivers, wetlands, mountain landscape, and rugged terrain—is a respite from the demands of daily life and the encroachment of commercial development. It has been this way for over a century because our State Constitution mandates:

> "The lands of the state, now owned or hereafter acquired,
> constituting the forest preserve as now fixed by law, shall be

---

[1] Following a jurisdictional inquiry, we retained both the appeal and cross appeal.

forever kept as wild forest lands. They shall not be leased, sold
or exchanged, or be taken by any corporation, public or private,
nor shall the timber thereon be sold, removed or destroyed."[2]

This unique "forever wild" provision was deemed necessary by its drafters and the people of the State of New York to end the commercial destruction and despoliation of the soil and trees that jeopardized the state's forests and, perhaps most importantly, the state watershed.[3]

In 1873, in response to widespread concern about the visible and potentially irrevocable depredation of the Adirondacks, the state appointed a commission of "trained forest experts" to "investigate and report a system of forest preservation" (Report of Committee on Forest Preserves, New York Assembly Documents, No. 36, at 3, 39). The commission's final report urged the creation of a forest preserve to "be forever kept as wild forest lands" (*id*.).

In 1885, the legislature passed a statute providing that "[a]ll the lands now owned or which may hereafter be acquired by the State of New York" within certain counties, "shall constitute and be known as the Forest Preserve" (L 1885, ch 283, § 7). In accordance with the recommendations of the report, the statute further provided that "[t]he lands now

---

[2] The provision was originally codified as article VII, § 7, and recodified as article XIV, § 1, in the Constitution of 1938.

[3] A report to the legislature in 1873 cautioned that "within one hundred years the cold, healthful, living waters of the [Adirondack] wilderness . . . will be required for the domestic water supply of the cities of the Hudson River valley" (Verplanck Colvin, *Report on the Topographical Survey of the Adirondack Wilderness of New York*, New York State Senate Documents, No. 53, at 41, 42 [1873]; *see e.g. Report of Committee on Forest Preserves, New York Assembly Documents, No. 36*, at 6 [1885]).

or hereafter constituting the forest preserve shall be forever kept as wild forest lands. They shall not be sold, nor shall they be leased or taken by any person or corporation, public or private" (*id.* § 8).

The original statutory and administrative efforts to protect the wild forest proved ineffective. Just two years after the Forest Preserve was created, the legislature afforded the comptroller the authority to sell, upon the recommendation of the Forest Commission, timber and land located on the boundaries of the preserve (*see* L 1887, ch 475, § 8, amending L 1885, ch 283, § 8). In 1893, the legislature conferred upon the Forest Commission "greatly enlarged powers" to sell timber, lease camp sites, and build roads and paths in the Forest Preserve (*Association for Protection of Adirondacks v MacDonald*, 228 App Div 73, 77-78 [3d Dept 1930], citing L 1893, ch 332).

The Constitutional Convention of 1894 assembled in response to widespread discontent with the destruction of the Adirondack forest.[4] The convention delegates were determined to maintain the wild forest nature of the Preserve—"these wide-spread evergreen woods"—both because of their value as a "great resort for the people of this

---

[4] The Forest Commission's Annual Report for the year 1893 noted the extent to which these policies had exacerbated the problem of exploitation: "[f]ully two-fifths of the great forest has already been cut over by lumbermen, who have removed the spruce and pine, leaving a forest in which there is little or no merchantable timber that can be floated down the streams" (*id.*; *see also Railroads in the Adirondacks*, NY Times, May 19, 1891, at 4 ["Commissioner Basselin has had every appearance of being on the side of those who desired to get possession of timber lands belonging to the State, and there was reason to believe that he might be in favor of running railroads through the forests to facilitate the work of stripping them of timber and to add to the profits of his private business"]).

State" and as a singular "capacious cistern, extending over this region" (4 Rev Rec, 1894 NY Constitutional Convention at 130). David McClure, a New York City lawyer and delegate, sponsored an amendment that would protect the Forest Preserve. McClure described how the failure to preserve the forest had already resulted in environmental distress: "Bars have risen in the Hudson on account of the washing down from these mountains, from which trees have been taken, and everywhere we have seen the falling of waters to an extent that has been dangerous" (*id.* at 132). Thus, one delegate exclaimed, "you must close the door" to commercial interests, "and you must close it tight, and close it right away; and not only that, you must keep it closed" (*id.* at 156).

The proposal was revised to ban the leasing of the land and the removal or destruction of timber. As revised, the amendment garnered unanimous support from the 1894 Constitutional Convention delegates and was submitted to a vote of the electorate and approved by the people of the State of New York. The drafters conceived that any use of the Forest Preserve contrary to the constitutional mandate may only be accomplished by an amendment approved by the electorate. The legislature, by more than a century of popular referenda proposing constitutional amendments for projects large and small within the Forest Preserve, confirmed and honored the Convention's solution. Thus, since becoming law in 1895, the people of New York have voted to amend article XIV, § 1, a total of 19 times to permit specific encroachments on the Forest Preserve.[5]

---

[5] For example, amendments in 1918 and 1927 respectively provided for the construction of a state highway from Saranac Lake to Old Forge and another from Wilmington to the top of Whiteface Mountain. Amendments in 1941 and 1947 permitted construction of ski

III

Only once before has this Court considered the meaning of the constitutional provision at issue here. In *Association for Protection of Adirondacks v Macdonald* (253 NY 234 [1930]), the Court held that a statute authorizing the construction of a bobsleigh run, requiring the destruction of 2,500 trees, for the 1932 Winter Olympics in Lake Placid was unconstitutional (*id.* at 242).

As the Court noted, the proposed project was miniscule in comparison to the great expanse of the Preserve, requiring only 4.5 acres of land out of a total of 1,941,403 (*id.* at 237). Unquestionably, the value to the public of hosting the Olympic games and bobsledding in the years thereafter was high. Nonetheless, we held that the bobsleigh run could not be built, despite its attractions, because the constitution forbade it:

> "However tempting it may be to yield to the seductive influences of outdoor sports and international contests, we must not overlook the fact that constitutional provisions cannot always adjust themselves to the nice relationships of life. The framers of the Constitution, as before stated, intended to stop the willful destruction of trees upon the forest lands, and to preserve these in the wild state now existing; they adopted a measure forbidding the cutting down of these trees to any substantial extent for any purpose" (*id*. at 241-242).

---

trails on Whiteface Mountain, Belleayre, Gore, South, and Pete Gay Mountains. A 1987 amendment allowed for the extension and widening of these ski paths. In 1957, an amendment authorized the relocation, reconstruction, and maintenance of existing state highways to eliminate dangerous curves and grades, and, in 1959, the same authority was extended to the existing interstate highway 502.

Applying *MacDonald* to the appeal before us, we conclude that the planned 27 miles of snowmobile trails may not be built without constitutional amendment.[6] Contrary to the Appellate Division, we do not interpret the provision as a bifurcated clause. All members of the Court agree that the constitutional protection is unitary (*see* dissenting op at 6-7). The forever wild provision ensures the preservation of state-owned land within the Adirondack Park (and Catskills) in its wild state (*see MacDonald*, 253 NY at 241). The destruction or removal of trees represented a principal threat recognized by the 1894 Convention delegates, and violation of the prohibition against the destruction of timber is a violation of the "forever wild" clause, because that prohibition was a means to the ultimate objective of protecting the forest as wilderness.

The construction of the Class II trails is, for constitutional purposes, no different than the construction of the bobsleigh run. Both would work a substantial change to the Forest Preserve. Both were explained as having a specific purpose that did not benefit the overall public interest (the Olympics and connecting local communities) and both were additionally justified as having a broader purpose that benefitted all the people of New York (opening the bobsleigh run and snowmobile trails for general public use).[7] The Class II connector trails require the clearing of approximately 27 miles of trail (the total land area

---

[6] Given our decision that the planned construction of the Class II trails is unconstitutional, plaintiff is not entitled to any additional relief on its cross-appeal.

[7] The impetus for the bobsleigh run was to facilitate the 1932 winter Olympic games, but it was thereafter to be "maintained, during the winter season, for the use and pleasure of the public" (L 1929, ch 417).

cleared or to be cleared is approximately one acre per mile of trail) resulting in the destruction of 6,184 trees of at least three inches diameters at breast height and 25,000 trees total, removal of rock and grading of the wild forest. By comparison, in *MacDonald*, the bobsleigh run and appurtenant facilities would have required the clearing of over 4 acres of the Forest Preserve and the destruction of many fewer trees, the blasting and removal of 50 cubic yards of rock and the construction of the bobsleigh track structure (228 App Div at 82).

Further, the Class II trails require greater interference with the natural development of the Forest Preserve than is necessary to accommodate hikers. Their construction is based on the travel path and speed of a motorized vehicle used solely during the snow season. The trails may not be built like roads for automobiles or trucks, but neither are they constructed as typical hiking trails.[8] Under DEC's 2009 guidance document, the Class II trails are not to exceed nine feet in width except on sharp curves, steep slopes, and bridges, where a 12-foot width is allowed—the same width as an interstate highway lane and enough to accommodate two SUVs, side-to-side. The proposed bench cuts—cuts into sloped ground and removal of the cut soil, rock and trees to create a "bench" upon which a trail can be placed—require clearing the land on the up- and down-slopes of the trail,

---

[8] The dissent elides the distinction between a factual finding by the courts below that the Class II trails in issue here are "more similar to hiking trails than to roads" (dissenting op at 15 n 4, quoting 175 AD3d 24, 28 [3d Dept 2019]) with a finding that they *are* hiking trails. How these trails are constructed is uncontested. Thus, whether these trails are more akin to hiking trails than to roads is relevant to determining DEC's compliance with its policies and procedures, but it does not resolve the issue here, for we are concerned with whether the construction of these trails violate the constitution.

resulting in the clearing of the forest floor up to 20 feet in width in certain areas—a span wide enough to site a two-car garage.

Defendants and the dissent offer two principal arguments in response. The first is that we should not view the destruction of trees as significant because the number is comparatively small per mile of trail (*see* dissenting op at 14). We rejected a similar argument in *MacDonald* when we declined to minimize the impact of the project by viewing it as a small percentage of the overall Forest Preserve (*see MacDonald*, 253 NY at 236-237 [rejecting the argument that "(t)he Forest Preserve within the Adirondacks consists of 1,941,403 acres" and "(t)he taking of four acres out of this vast acreage for this international sports' meet seems a very slight inroad upon the preserve for a matter of such public interest and benefit to the people of the State of New York"]).

Second, defendants and the dissent contend that the project's impacts are justified because it enhances access to the Preserve and provides a variety of recreational opportunities. That analysis proceeds from a fundamental misunderstanding. The constitution provides for access and enjoyment of the Forest Preserve as a wild forest: "very considerable use may be made by campers and others without in any way interfering with this purpose of preserving them as wild forest lands" (*MacDonald*, 253 NY at 241, citing Robert Marshall, *The Problem of the Wilderness*, 30 The Scientific Monthly 141, 141 [1930]). The project proposed here, like that proposed in *MacDonald*, is impermissible "simply and solely for the reason that . . . the Constitution says that it cannot be done" (*id.*).

Improving recreation and the use and enjoyment of the preserve are laudable aims, but they were insufficient in *MacDonald* to obviate the need for a constitutional amendment.

The fact that defendants may be doing everything they believe feasible to minimize the destruction of the Forest Preserve in the construction of the Class II trails, by, for example, reducing the number of trees cut, routing the trails as close to the periphery or highway as possible, and implementing erosion control measures, does not support a different conclusion. The issue is simply whether the project, as proposed, complies with the constitutional provision.

If the people of the State of New York decide that these Class II community connector trails are sufficiently beneficial, despite their impact on the Forest Preserve, then that determination may be realized through constitutional amendment. Indeed, other projects to enhance recreation or provide access by motorized transport have required constitutional amendment. Since its enactment in 1894, the forever wild provision has been amended 19 times; 4 of those amendments have come in the past 15 years. Those constitutional amendments have authorized, among other initiatives, the construction and maintenance of specific highways, ski trails, and bike lanes in the Forest Preserve. If a constitutional amendment is required for projects that enhance recreation (bobsleigh runs; ski trails) or improve mobility (roads) or do both (bike lanes within preexisting roads), then

a constitutional amendment is also required to construct rights of way for a different form of motorized transportation (snowmobiles).[9]

If the trails at issue here are equally important to New York as those projects were, then the people can express their will accordingly through the democratic process. Until they say otherwise, however, the door is closed because the planned Class II trails are constitutionally forbidden.

The order of the Appellate Division should be affirmed, without costs.

---

[9] The 2017 amendment to article XIV, § 1, provided a simplified method of advancing a limited set of projects in the public interest, by adding 250 acres to the Forest Preserve and creating a "health and safety land account" of 250 acres of Forest Preserve land. The drafters of this amendment recognized that, under article XIV, it was "overly cumbersome, time consuming and expensive" for small communities to amend the Constitution for every modest public project they wished to execute (Senate Introducer's Mem in Support). Accordingly, with the land account established, a town, village, or county may be granted Forest Preserve land to address a limited set of public projects as long as no other alternative exists (*see* Assembly Bill 2016-10721, available at https://nyassembly.gov/leg/?default_fld=&leg_video=&bn=A10721&term=2015&Summary=Y&Text=Y).

STEIN, J. (dissenting):

For well over one hundred years, the leaders and citizens of this State have strived to protect one of its most precious resources, the Adirondack Forest Preserve, consistent with the public policy that "[w]hatever the advantages may be of having wild forest lands

preserved in their natural state, the advantages are for every one within the State and *for the use of the People* of the State" (*Association for Protection of Adirondacks v MacDonald*, 253 NY 234, 238-239 [1930] [emphasis added]).   To that end, the Forever Wild provision states that

> "[t]he lands of the state, now owned or hereafter acquired, constituting the forest preserve as now fixed by law, shall be forever kept as wild forest lands.  They shall not be leased, sold or exchanged, or be taken by any corporation, public or private, nor shall the timber thereon be sold, removed or destroyed"

(NY Const, art XIV, § 1).

This Court has long rejected an interpretation of the Forever Wild provision as mandating that, in order to keep the Forest Preserve "as wild forest lands," we must endeavor to "preserve it from the interference in any way by the hand of man" (*MacDonald*, 253 NY at 238).  That interpretation is contrary to the guiding principle that "[t]he Forest Preserve and the Adirondack Park . . . are for the reasonable use and benefit of the public" (*id.* at 240-241).  Rather, we recognized that "[a] *very considerable use* may be made by campers and others without in any way interfering with th[e] purpose of preserving them as wild forest lands" (*id.* at 241 [emphasis added]).

The project at issue in this appeal—initiated by respondent New York State Department of Environmental Conservation (DEC) after a multi-year planning, public comment, and review process in conjunction with the Adirondack Park Agency—involves the construction in the Forest Preserve of segments of trails totaling approximately 27 miles to be used by hikers and, during the winter, snowmobilers.  I disagree with the majority's conclusion that the project "would work a substantial change to the Forest Preserve"

(majority op at 9).  The majority misreads our State Constitution to arrive at the mistaken conclusion that the people of this State must undertake the arduous process of constitutional amendment to enable a long-standing public use of the Preserve to continue in a manner that is both safe for, and designed to protect, the Preserve's most sensitive resources. Because the majority's holding thwarts the intention of the drafters of the Forever Wild provision (NY Const, art XIV, § 1) and manifestly contradicts this Court's precedent, I dissent.

I.

The six-million-acre Adirondack Park is currently visited by approximately 12.4 million people annually (*see* Adirondack Council, State of the Park, 2020-2021, at 4, https://www.adirondackcouncil.org/vs-uploads/sop_archive/1599077695_SOP_2020_FINAL.pdf [accessed Apr. 9, 2021]), and the 2.6 million acres of state-owned Forest Preserve within the Adirondack Park contain nearly 2,000 miles of trails (New York State Department of Environmental Conservation, Welcome to the Adirondacks, https://www.dec.ny.gov/outdoor/119734.html [accessed Apr. 9, 2021]).  The state-owned land within the Park is classified into several basic categories (*see Matter of Adirondack Wild:  Friends of the Forest Preserve v New York State Adirondack Park Agency*, 34 NY3d 184, 192 [2019]; Adirondack Park State Land Master Plan, at 16 [August 2019]), with most of the land in the Forest Preserve classified as Wild Forest (*see* Adirondack Council, State of the Park, 2020-2021, at 4).  Under the Master Plan, "[m]otor vehicle use, including snowmobile use, is expressly authorized in wild forest areas" (*Adirondack Wild*, 34 NY3d at 193; *see* Master Plan, at 34-39).  In fact, even in the absence of a single constitutional

amendment authorizing snowmobile trails, there are nearly 800 miles of trails in the Forest Preserve that can accommodate snowmobiles. Despite the existence of these trails, the majority deems unconstitutional the construction of 27 miles of new trails that are suitable for use by snowmobiles—but will serve multiple purposes year-round—on the ground that the new trails will lead to "a substantial change to the Forest Preserve" (majority op at 9). It is unclear how the continuation of a long-standing public use by means of a project that reduces the total number of trails in the Preserve and protects its most ecologically sensitive areas constitutes a substantial change or impacts the wild forest nature of the Preserve.

By way of background, in 2006, DEC and the Office of Parks, Recreation and Historic Preservation adopted the Snowmobile Plan for the Adirondack Park/Final Generic Environmental Impact Statement. The plan anticipated a new trail system with no material increase in miles, but with the development and creation of trails to connect communities located within the Park, as well as the redesignation of existing trails within the forest interior as nonmotorized trails (*see Matter of Adirondack Council, Inc. v Adirondack Park Agency*, 92 AD3d 188, 189 [3d Dept 2012]). Under the plan, the new trails would be open year-round for recreational use by, not just snowmobilers, but also hikers, cyclists and cross-country skiers. The proposed placement of trail segments at the periphery of Forest Preserve areas—near existing roads—and the closure of multiple preexisting snowmobile trails located in the interior of the preserve was for the purpose of "ensur[ing] protection of sensitive resources on both public and private land" and achieving a "net benefit to the Forest Preserve lands" themselves (DEC & Office of Parks, Snowmobile Plan for the

Adirondack Park/Final Generic Environmental Impact Statement, 4 [October 2006]; *see*

*Adirondack Council, Inc*., 92 AD3d at 190).

In 2009, to implement the plan, DEC and respondent APA adopted the

"Management Guidance: Snowmobile Trail Siting, Construction and Maintenance on

Forest Preserve Lands in the Adirondack Park."  The Guidance provides for a two-tiered

classification system for snowmobile trails, consisting of Class II, community connector

trails and Class I, secondary trails that are spur trails or ungroomed (*see Adirondack*

*Council, Inc*., 92 AD3d at 189-190).  This appeal involves only the Class II trails.

Like the snowmobile plan, the Guidance called for the closure of trails to motorized

vehicle use in interior areas of the Preserve and the placement of new trails along the

periphery of the forest to the extent possible to "shift[] the highest snowmobile use to the

outer periphery of Forest Preserve lands" and lead to "lower noise levels, lower exhaust

emission levels, decreased impacts on wildlife and reduced user conflicts between users

participating in motorized and non-motorized forms of recreation" in "the wilder, more

remote areas of the Forest Preserve."  The Guidance further provided that the cutting of

"overstory" trees was to be avoided in order to maintain a closed forest canopy, and that

old growth and large trees should be protected.  Thereafter, DEC constructed 11 non-

contiguous Class II trails or trail segments on Forest Preserve land.  The 27 miles of new

trails constructed between January 1, 2012, and October 15, 2014  required that a total of

6,184 trees measuring at least three inches or larger at breast height (DBH) be cut.

Following a trial on plaintiff's claims in this declaratory judgment action, the courts

below determined that the term "timber" in the Forever Wild provision "is not limited to

marketable logs or wood products, but refers to all trees, regardless of size" (175 AD3d at 31); thus, "approximately 25,000 trees," including seedlings and saplings, "either had been or would be cut to construct the trails" (*id.*). Supreme Court—relying on the evidence that the tree cutting was not for commercial purposes, involved no clear cutting, and was in the nature of "the creation of a narrow trail through a wooded area" for use by the public— held that "the number of trees cut herein is not so 'substantial' under the within circumstances as to render the actions violative of the Constitution." In contrast, the Appellate Division held that the construction of the Class II trails would result in an unconstitutional destruction of timber in the Forest Preserve "'to a substantial extent' or 'to [a] material degree'" (175 AD3d at 31-32, quoting *MacDonald*, 253 NY at 238). Nevertheless, despite declaring that "construction in the Forest Preserve of the Class II Community Connector trails that were planned and approved as of October 15, 2014[] violates NY Constitution, article XIV, § 1" (*id.* at 33), the Appellate Division—like Supreme Court—concluded that "plaintiff failed to demonstrate how the construction of Class II trails, which have similar aspects to foot trails and ski trails and have less impact than roads or parking lots, impairs the wild forest qualities of the Forest Preserve" (*id.* at 29).

## II.

As noted by the majority, all members of the Court disagree with the Appellate Division's bifurcated analysis of article XIV, § 1 (majority op at 4, 9). The two sentences of this provision are interrelated such that the destruction of timber to a substantial or material degree necessarily violates the 'forever wild' prescription of Article XIV and,

concomitantly, the removal of timber that is not sufficiently substantial to impact the wild forest nature of the Preserve will not be unconstitutional. Although the amount of timber cut is central to the inquiry, the *MacDonald* "substantial extent" or "material degree" standard cannot be reduced to merely an exercise in tree counting, but requires consideration of the scope, nature, purpose and impact of the project on the affected area and on the Forest Preserve as a whole.

Turning to the legal issues disputed by the parties, the construction of the trails at issue here—involving the removal of 6,184 trees three inches DBH or larger—took place over 27 miles of non-contiguous, multi-use trails that did not adversely affect old-growth trees, retained a closed canopy, provided for erosion control, involved no infiltration of invasive species, and resulted in the closure to motorized use of 46 miles of preexisting snowmobile trails in sensitive interior areas. Under these circumstances, the subject timber cut is not sufficiently substantial or material, in itself, to impair the wild forest nature of the 2.6-million-acre Preserve within the meaning of the Forever Wild provision, particularly inasmuch as this Court has long recognized the primary importance of the public's right to access the Preserve (*see MacDonald*, 253 NY at 238-239).

In discussing the history of the 1894 amendment that first added the Forever Wild provision, the majority correctly observes that the Forever Wild provision had its genesis in widespread public concern over the depredation of timber by industrial logging interests and the impact of commercial exploitation on the forest and watershed (*see* majority op at 5-7). The 1885 statute that created the Preserve mandated that the "forest preserve shall be forever kept as wild forest lands" and could not be sold, leased or "taken by any person

or corporation, public or private" (L 1885, ch 283, § 8). At trial, plaintiff provided undisputed testimony that the statute was enacted in response to the "[w]idespread belief that commercial logging was destroying the Adirondacks and all its value."

Nevertheless, the Forest Commission, which was tasked with maintaining and protecting the Preserve (*see* L 1885, ch. 283, §§ 1, 9), continued to sell both land and timber in the Forest Preserve (*see* L 1893, ch. 332 §§ 103, 121). Thus, at the 1894 Constitutional Convention, the Committee on the Forest Preserve was animated by a concern that a forest "form[ed] during the lapse of uncounted ages can be swept away in a few years by the acts of the lumbermen and the fires that follow in his path" (4 Rev. Rec, 1894 NY Constitutional Convention at 130). The delegates recognized the value of the wild forest as a watershed (*id.* at 130-132), "as a great resort for the People of this State . . . for seeking, finding and preserving health" (*id.* at 131-132), and as "a symbol of sport, of recreation and pleasure-seeking" (*id.* at 133). With respect to timber, the proposed Constitutional amendment initially provided only that the timber on Forest Preserve lands could not be "sold" (*id.* at 124), but ultimately was revised to include the additional restriction that timber cannot be "removed or destroyed" (*id.* at 158). "Destruction of trees by flooding, through the erection of dams, was decried and was one of the reasons suggested for adding the word 'destroyed' to the amendment" (*Association for Protection of Adirondacks v MacDonald*, 228 App Div 73, 79 [3d Dept 1930]). In that vein, the chairperson of the Committee on the Forest Preserve, David McClure, expressed dismay at the "selling to lumbermen some of the trees, regardless of the devastation, burnings and stealing[] that follow in the lumberman's track" and at "the notion of the lumbermen cutting the woods and taking out the best trees and

destroying, with every tree he takes, [50] in addition" (4 Rev Rec, 1894 NY Constitutional Convention at 139).

As the foregoing demonstrates, defendants are correct that the primary aim of the drafters was the prevention of commercial logging or the sale of land for that purpose, in order to preserve it for "the great number of pleasure seekers, [and] the great number of invalids that annually visit that territory" (*id.*). Thus, while the delegates intended to protect the Preserve from commercial exploitation, they did not intend to create a purely isolated and untouched forest haven; rather, they preserved the forest for the use and enjoyment of the People of the State of New York. That is, the delegates considered the protection *and the use* of the Preserve to be interlocking goals, not mutually exclusive or incompatible interests.

Our cases have consistently recognized that these are interlocking goals— preservation *for the purpose* of enabling recreational use of the wild forest land in the Preserve by the People. In 1899, just five years after the Forever Wild provision was added to the Constitution, this Court recognized that the "primary object of the . . . forest preserve was to save the trees for the threefold purpose of promoting the health and pleasure of the people, protecting the water supply as an aid to commerce and preserving timber for use in the future" (*People v Adirondack Ry. Co.*, 160 NY 225, 248 [1899] [emphasis added] [holding that a railroad operated by steam in the Park was not a permissible use of the land given "the well-known danger of destruction of forest lands by fires communicated by

locomotives"]).[1]    We further explained that, in making the Forest Preserve lands

"absolutely inalienable," their "*use* is not restricted, either by legislation or circumstances,

to a special locality, or to a limited number of inhabitants, but *is extended to all the people*"

(*id.* at 247-248 [emphasis added]).

Approximately 30 years later, in *MacDonald*, the Court stated that

> "[t]he purpose of the constitutional provision, as indicated by
> the debates in the Convention of 1894, was to prevent the
> cutting or destruction of the timber or the sale thereof, as had
> theretofore been permitted by legislation, to the injury and ruin
> of the Forest Preserve.  To accomplish the end in view, it was
> thought necessary to close all gaps and openings in the law,
> and to prohibit any cutting or any removal of the trees and
> timber *to a substantial extent*"

(*MacDonald*, 253 NY at 238 [emphasis added]).  The Court reaffirmed its understanding

that "the advantages" of preserving the "wild forest lands . . . in their natural state . . . are

for everyone within the State and for the *use* of the people of the State" (*id.* at 238-239

[emphasis added]).  In other words, we have long considered the recreational use of the

wild forest lands to be constitutional, so long as such use does not impair the wild nature

thereof.

*MacDonald* is especially instructive here.  The *MacDonald* Court noted that

"[s]ome opinions, notably those of the Attorneys-General of the State . . . have even gone

so far as to state that a single tree, and even fallen timber and dead wood, cannot be

---

[1] The majority errs in stating that this Court has considered the meaning of the Forever
Wild provision only once before, in *MacDonald* (*see* majority op at 8).  In fact, we first
considered the meaning of the provision and explained its purpose in *People v Adirondack
Ry. Co.* (160 NY 225, 248 [1899]), shortly after it was enacted.

removed; that to preserve the property as wild forest lands means to preserve it from the interference in any way by the hand of man" (253 NY at 238). However, *MacDonald* rejected that strict reading of the constitutional provision, stating:

> "The words of the Constitution, like those of any other law, *must receive a reasonable interpretation*, considering the purpose and the object in view. . . . The Adirondack Park was to be preserved, not destroyed. Therefore, *all things necessary were permitted*, such as measures to prevent forest fires, the repairs to roads and proper inspection, or *the erection and maintenance of proper facilities for the use by the public which did not call for the removal of the timber to any material degree*. The Forest Preserve is preserved *for the public*; its benefits are for the people of the State as a whole"

(*id.* [emphasis added] [citations omitted]). It bears emphasis that *MacDonald* recognized that the maintenance of proper facilities for public use and access are among the "things necessary" that are permitted, so long as they do not result in "the removal of the timber to any material degree" (*id.*). As noted above, we also explained that "[a] very considerable use may be made by campers and others without in any way interfering with this purpose of preserving them as wild forest lands" (*id.* at 241).

Under *MacDonald*, *insubstantial* cutting to allow public use of the forest consistent with its character as a wilderness is constitutional. That rule follows from our recognition that the cutting of "timber" to provide for public use of the Preserve in a manner that maintains the Preserve's wild forest nature is not a competing policy interest to be balanced against preservation of the wilderness; rather, both concerns are central to the purpose of the Forever Wild provision. In any event, it was settled by *MacDonald* over 90 years ago that there is no absolute bar on cutting "timber" to enable the public to use and enjoy the

Preserve as a wild forest, provided that such cutting is not to a "substantial extent" or to

"any material degree" (253 NY at 238, 242). Thus, two of the questions before us on this

appeal are what is "timber" and what is cutting of it to a "substantial extent" or "material

degree."[2]

With respect to the understanding of the term "timber" around the turn of the last

century, contemporaneous statutes distinguished between the terms "tree" and "timber" or

defined timber as trees of a certain size (*see* Former Fisheries, Game and Forest Law § 280

[enacted in 1895 and prohibiting trespass on Forest Preserve land and "cutting or carrying

away or causing to be cut or assisting to cut or carry away, any tree, bark or timber within

the forest preserve"]; L 1892, ch 707 § 3 [permitting the Forest Commission to purchase

lands subject to the right of the owner to remove timber provided that it was not hard wood

or "soft wood with a diameter of less than ten inches at the height of three feet"]; L 1894,

ch. 317 § 84 [permitting those who discovered mines on state lands to cut timber necessary

to make a road and requiring reimbursement to the state only for trees measuring four

---

[2] To the extent that plaintiff and the courts below read the word "timber" in the constitutional provision as referring to seedlings and saplings, that reading is contrary to the facts of *MacDonald*, as well as to the instruction therein that the Forever Wild provision "must receive a reasonable interpretation, considering the purpose and object in view" (253 NY at 238). Regarding the facts, the record on appeal in *MacDonald* makes clear that the smallest "tree" considered in that case was still at least three inches DBH. Moreover, it is not reasonable to interpret the term "timber" in the constitutional provision to include seedlings and saplings because only a few seedlings will grow into saplings and only a few of those saplings will grow into trees. Nevertheless, while seedlings and saplings may not be "timber," defendants properly concede that a project's effect on *all* vegetation, including small trees and new growth, must be considered in determining a project's effects on the wild forest nature of the Preserve.

inches or more at a height of one foot from the ground]).  There is no reason to believe that the drafters of the Forever Wild provision read the term differently.[3]

On a more pragmatic note, there are approximately 2,000 miles of hiking trails in the Preserve.  Because maintenance of those trails requires the clearing of seedlings and saplings, as well as side cutting (*see* United States Department of Agriculture, United States Forest Service, Trail Construction & Maintenance Notebook, Clearing and Brushing; Removing Trees, https://www.fs.fed.us/t-d/pubs/htmlpubs/htm07232806/page07.htm [accessed Apr. 9, 2021]), adoption of plaintiff's interpretation of the term "timber" to include seedlings and saplings would disincentivize trail maintenance and thereby unreasonably increase the risk to the millions of people who use the Preserve each year. Any interpretation of the constitutional provision that would discourage the maintenance of existing facilities for the public would be contrary to our recognition in *MacDonald* that the "Forest Preserve and the Adirondack Park within it are for the reasonable use and benefit of the public" and that "the use of the park by campers and those who seek solitude of the north woods" is entirely appropriate (253 NY at 240-241).

---

[3] During the 1915 Constitutional Convention, the delegates proposed that the words "timber thereon" be changed to "trees and timber thereon" in order to "mak[e] more inclusive the scope of the provision" (2 Rev Rec, 1915 NY Constitutional Convention at 1340)—reflecting the delegates' understanding that "trees" and "timber" were not interchangeable terms.  Ultimately, the proposed 1915 Constitution was voted down in its entirety and the provision remained unchanged, but the proposed amendment indicates that the delegates in 1915 rejected the interpretation of the original Forever Wild provision that plaintiff now urges and the courts below adopted, namely that trees of all sizes are "timber."

In my view, under *MacDonald*, the timber cutting at issue here was not to such a substantial extent or material degree that it violated the Forever Wild provision. The purpose of the cutting is to open safe, year-round trails geared toward keeping users on the trails and out of sensitive areas. Unlike in *MacDonald*, where the cutting of 2,500 trees three inches DBH or larger was concentrated across a 1¼ mile long path, the trail construction at issue here does not involve a clear-cut, but the creation of narrow trails that run a total of 27 miles in segments throughout the vast Forest Preserve. Moreover, the construction at issue in *MacDonald*, which the Court deemed unconstitutional, involved "blast[ing] away about fifteen large boulders and the ends of three or four ledges of rock, entailing the removal by blasting of about 50 cubic yards of rock" (228 App Div at 76) to make way for the construction of a bobsled run plus the return route, altering the vista of the Sentinel Range and changing the character of the area. Although the total number of trees over three inches DBH to be cut is significant at 6,184 trees, the timber cut in the construction of the Class II trails is not substantial or material when spread out over the course of 27 miles and given that their purpose is to allow access to and public use of the Preserve in a manner which is fully harmonious with the natural surroundings; nor does the cut alter the wild forest nature of the Preserve.

Creating hiking trails for year-round use is entirely consistent with the purpose underlying the constitutional protection of the Forest Preserve, and the construction at issue here involves trails that the courts below found to be more in the nature of hiking trails

than roads.[4]  Such construction does not work a substantial change to the Forest Preserve within the meaning of *MacDonald*, particularly given that the construction of the Class II trails furthers the purpose of the Forever Wild provision.  Specifically, as proposed, the construction at issue resulted in the rerouting of 46 miles of preexisting trails that ran through sensitive interior areas of the Preserve in order to close them to motorized use, which serves to protect the wild forest nature of the Preserve.  Given the undisputed net benefit to the Preserve itself, the courts below correctly concluded that "construction of the Class II trails did not violate" the first sentence of "the 'forever wild' clause" (175 AD3d at 28).

Apart from the construction techniques and ecological purpose of these trails, consideration of the use to which they will be put is also proper under *MacDonald*. *MacDonald* involved, not just blasting, but also the clearing of thousands of trees for a "[s]port[] which require[s] a setting that is man-made [and] unmistakably inconsistent with

---

[4] The majority notes that "projects to enhance recreation or provide access by motorized transport" in the Forest Preserve have been authorized by constitutional amendment, including the construction and maintenance of specific state highways (majority op at 12-13).  To the extent the majority suggests that snowmobile trails are akin to state highways, rather than hiking trails (*see id.* at 10 n 8), such a determination would be contrary to the affirmed findings of fact of the courts below, which we are "without power to review . . . if such findings are supported by evidence in the record" (*Congel v Malfitano*, 31 NY3d 272, 294 [2018], quoting *Humphrey v State of New York*, 60 NY2d 742, 743 [1983]).  Specifically, the courts below found that the trails are "more similar to hiking trails than to roads" (175 AD3d 24, 28 [3d Dept 2019]).  That finding is supported by evidence in the record; as the Appellate Division explained, "[a]lthough the width of Class II trails falls between the width of foot trails (which vary from two to eight feet wide) and forest roads (which are typically between 12 and 20 feet wide), the trails are not paved or covered in gravel and are not crowned to divert water" (*id.* at 28).

the preservation of these forest lands in the[ir] wild and natural state" (228 App Div at 82). The Court explained that "[t]he same plea made for the toboggan slide in winter might be made for the golf course in summer, or for other sports requiring the use of the removal of timber. In other words, this plea in behalf of sport is a plea for an open door through which abuses as well as benefits may pass" (253 NY at 242). Those concerns are not present here because, as Supreme Court stated, "trails for access would appear to be the quintessential example of an appropriate use of the Preserve." The trails do not irrevocably change the wild nature of the land affected, commoditize it in the manner of a "golf course" or "toboggan slide," or encourage large, concentrated gatherings of sporting participants and spectators. Given the purpose and nature of these trails, together with the affirmed findings of fact that the trail construction techniques minimized adverse environmental impacts, it cannot be said the construction of the trails impaired the wild forest nature of the Preserve.

The majority's conclusion to the contrary ignores the nearly 800 miles of similar trails already existing in the Preserve, the constitutionality of which is not disputed. Limiting public access to the Preserve on trails such as these, which are akin to hiking trails, defeats this Court's instruction in *MacDonald* that the Forever Wild provision "must receive a reasonable interpretation, considering the purpose and the object in view" (253 NY at 238). Because the majority's decision misapplies our precedent and undermines the very purpose of protecting the Forest Preserve for the benefit of the public seeking to access it in its wild forest state, I am compelled to dissent.

Order affirmed, without costs. Opinion by Judge Rivera. Judges Fahey, Garcia and Wilson concur. Judge Stein dissents in an opinion, in which Chief Judge DiFiore concurs.

Decided May 4, 2021